Peter J. BRENNAN, Secretary of Labor, United States Department of Labor, Appellant,

v.

ACE HARDWARE CORPORATION, Appellee.

No. 73-1498.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 11, 1974.

Decided April 3, 1974.

Jacob I. Karro, Atty., U. S. Dept. of Labor, Washington, D. C., for appellant.

Dayton O. Rasmussen, Jr., and E. R. Freeberg, Midwest Employers Council, Inc., Omaha, Neb., for appellee.

Before MEHAFFY, Chief Judge, and GIBSON and WEBSTER, Circuit Judges.

GIBSON, Circuit Judge.

The Secretary of Labor appeals from a judgment entered for defendant Ace Hardware Corporation (hereinafter Employer) in this action instituted under Section 7(b) of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* We affirm the judgment entered for the Employer.

This appeal presents an issue of first impression before any appellate court. At issue is whether the Secretary's actions in this case complied with the statutory directive of attempting to effect voluntary compliance through "informal methods of conciliation, conference, and persuasion" pursuant to 29 U.S.C. § 626(b) before instituting legal action. The District Court [1] found he did not, holding that the Secretary did not properly attempt to achieve voluntary compliance by the Employer before instituting legal action.

Employer, a corporation with principal offices in Chicago, Illinois, operates warehouse distribution plants in Atlanta, Georgia; San Francisco, California; Chicago, Illinois; and Lincoln, Nebraska, the location of the alleged discriminatory practices in this case. In late 1971, Employer commenced operating the Lincoln plant and transferred Charles L. Bates from Chicago to be the general plant manager. In November, 1971, Bates reviewed the employees already assigned to the Lincoln plant and chose Dallas D. Howell, a truck driver for over 16 years with Employer, to be traffic manager, whose responsibilities included the initial interviewing of new applicants for positions as truck drivers. Howell had never hired employees before

1. The Honorable Warren K. Urbom, Chief Judge, United States District Court, District of Nebraska, heard the case without a jury, and his opinion is published as Brennan v. Ace Hardware Corp., 362 F.Supp. 1156 (D. Neb.1973).

and was not aware of the Act. Bates was generally aware of the Act, but did not inform Howell of it. Bates made the final decision concerning the hiring of new employees, although Howell could eliminate applicants before Bates reviewed anyone.

When Howell assumed his position as traffic manager, the company had received 45 applications for six or seven positions as truck drivers. Howell adopted the following procedure to screen the applicants for employment. After reviewing the applications. Howell scheduled and conducted personal interviews. During those interviews, Howell would write certain comments on a section marked "remarks" on the application forms.[2] On Byrl A. Prichard's application, the notation "Age?" was written. Prichard was 52 years old during the winter of 1971. Robert H. Long's application had the same notation. Cecil Raymond Richard's application contained the comment, "to [sic] old." On James Elmer Johnson's application, "Age?" also appeared. "No" was written on the applications of Donald Eugene Rudy, Herbert Jess Grady, and Samuel D. Tipton. The record does not reveal if any comments were written on Bernard Chapman's application. Each of the above applicants was over 50 years of age. After the initial interview with Howell, some applicants were scheduled for polygraph examinations, Department of Transportation tests (known as D.O.T.'s), and physical examinations. None of the applicants over 50 years of age was hired by the Employer before December 29, 1971, the date of

the first visit by the compliance officer with the Department of Labor.

Acting upon complaints of Prichard and Johnson, the Secretary decided to investigate the Employer for possible violations of the Act. On December 29, 1971, Donald R. Chleborad, a compliance officer with the United States Department of Labor, Employment Standard Administration, visited the Employer. Chleborad's job included investigating violations of the Act in question, the Fair Labor Standards Act, the Minimum Wage and Overtime Act, and others. On December 29th, Chleborad met with Bates from approximately 9:00 a.m. to 3:00 p.m. to discuss violations of the Act. He informed Bates that he was investigating possible violations of the Act as reported by Prichard and Johnson. Bates was cooperative, and the two reviewed and discussed the actual applications in Howell's office. Chleborad asked Bates what the notations referring to "age?" meant and was told that "'age' does not mean 'age' as such; it means an unqualified individual or somebody who cannot do the job." Bates told Chleborad that Prichard was not hired because he was unqualified and that Johnson had failed the Department of Transportation tests. The meeting ended and Chleborad said that he would contact Bates again.

On January 7, 1972, Chleborad returned and initially met with Bates. Howell was called in by Bates and, upon questioning by Chleborad, said that Johnson had failed the Department of Transportation tests and Prichard was unqualified and had a bad attitude[3] as

---

2. The record indicates that there may be a conflict concerning what information was recorded on these applications by Howell during or immediately after the interviews and what might have been recorded at a later time, specifically after visits by the conciliation officer with the Department of Labor. In evaluating the Secretary's efforts to comply with the statutory directives, we accord the unresolved factual issues in favor of the Secretary, resting largely on the testimony of Donald R. Chleborad, a compli-

ance officer with the United States Department of Labor, Employment Standard Administration, who investigated Employer in this case.

3. Apparently Howell and Bates concluded that Prichard had a bad attitude because Prichard was insistent to find out why he was not hired and two other truck drivers whom he knew were hired. Prichard had called Howell and questioned him concerning his failure to obtain employment.

reasons for the company refusing to hire them. Chleborad was informed that Long was being hired, as it turned out on a part-time basis when additional drivers were required (termed "extra board" by the Employer and "10%" by the workers). Chleborad was also told at this meeting that "age" referred to "an unqualified individual or that no job opening was available."

On January 28 or 29, 1972, Chleborad telephoned Bates and told him the failure to process applications of those over 50 years of age "would definitely appear to be a violation of the Age Discrimination Act." Bates said that he still would not hire Prichard. Chleborad told Bates that he would "submit the file accordingly to the supervisor, and in turn to the Regional Office for consideration."[4] No other information pertinent to this appeal was exchanged between the Secretary and the Employer. The Secretary did not contact the Employer again before the commencement of this action, approximately four months later.

On May 23, 1972, the Secretary filed the complaint in this action against the Employer seeking to permanently enjoin any violations of the Act by the Employer, for costs of the action, further equitable relief including any "amounts due individuals by reason of said violations," interest on those amounts, and an order compelling the employment of these individuals.[5] The individuals were not named in the complaint, and the trial mainly centered on the alleged violations in regard to Prichard and Johnson. During trial, the District Court admitted a field operations handbook (an exhibit of both parties) issued by the Secretary to compliance officers setting forth operative procedures to be employed to implement this Act and also other federal labor acts.

The District Court first held:

I think it is clear by the greater weight of the evidence that Howell preferred men of some maturity, but was reluctant to take as truck drivers men over the age of 50 years; that he would have hired men over the age of 50 years, if he had not been able to hire enough truck drivers under that age who were qualified; that age was a factor in Howell's mind from the outset of the employment of truck drivers in November, 1971, and remained a factor throughout that employment process; and that Byrl A. Prichard was not hired by the defendant because of age, in violation of the Act.

However, the District Court found for the defendant reluctantly, because the Secretary failed to comply with the voluntary compliance requirement of the Act, which in part reads:

Before instituting any action under this section, the Secretary shall attempt to eliminate the discriminatory practice or practices alleged, and to effect voluntary compliance with the

---

4. On this contested issue of what Chleborad told Bates, the District Court concluded from the entire testimony that:

[T]here was no informing by the compliance officer to the employer that the file in fact was being referred for review. Twice the compliance officer informed Bates that the compliance officer would discuss the matter with his supervisor and once told Bates that he, the compliance officer, would "consider" sending the file to the regional office.

Obviously, the District Court credited other testimonies than Chleborad's.

5. None of the complainants testified that he wanted employment with defendant. Prich-

ard, who had gained other employment as a truck driver before trial, testified that he did not want to work with defendant because "I don't think it would be a very good relationship." Prichard obtained permanent employment on February 25, 1972, and drew unemployment of $504.00 and part-time wages as a truck driver of $136.70 from approximately December 1, 1971, until February 25, 1972.

Although Prichard testified that he accepted an employment offer made by Howell on December 16th or 17th as an "extra board" truck driver, Howell testified that Prichard was never offered any type of employment. Nevertheless, Prichard never did work for the Employer.

requirements of this chapter through informal methods of conciliation, conference, and persuasion.

29 U.S.C. § 626(b).

In relying on the standards that the field operations handbook describes, the District Court found that the compliance officer failed to request the Employer to "make whole" Prichard (basically pay wages he would have received had he been hired), did not specifically and directly tell the Employer that the file was being referred for review, and did not allow the Employer the opportunity to express his views, in writing or otherwise, on the charges, specifically in light of the "make whole" remedy. Since these findings of fact are not clearly erroneous and the conclusions of law involve no interpretive error, we affirm the District Court with the following comments.

As we have not previously interpreted any provision of the Act and since the implementation of the Act will be affected by this decision, a more extensive analysis of the Age Discrimination in Employment Act (ADEA) is in order.

Passed in 1967, the Act was designed to promote "employment of older persons based on their ability rather than age" and to prohibit "arbitrary age discrimination in employment." 29 U.S.C. § 621(b); *accord*, Hodgson v. First Fed. Sav. & L. Ass'n of Broward Co., Fla., 455 F.2d 818, 820 (5th Cir. 1972) (hereinafter *First Fed. Sav.*); Stringfellow v. Monsanto Company, 320 F.Supp. 1175, 1179 (W.D.Ark.1970). President Johnson in his Older American message of January 23, 1967, recommended the passage of the Act and stated:

Hundreds of thousands, not yet old, not yet voluntarily retired, find themselves jobless because of arbitrary age discrimination. Despite our present low rate of unemployment, there has been a persistent average of 850,000 people age 45 and over who are unemployed. Today more than three-quarters of the billion dollars in unemployment insurance is paid each year to workers who are 45 and over. They comprise 27 percent of all the unemployed, and 40 percent of the long-term unemployed.

Quoted in H.R. No. 805, 90th Cong., 1st Sess., U.S.Cong. & Adm.News 2213, 2214 (1967). (The Senate Bill was passed instead of the House Bill; however, the Senate Bill contained the exact language of the original House Bill.) ADEA was passed by Congress and its purview limited to persons "at least forty years of age but less than sixty-five years of age." 29 U.S.C. § 631.

The Act commendably seeks to remedy the neglect of older persons in employment practices by employers, employment agencies, and labor organizations, 29 U.S.C. §§ 623(a), (b) and (c).[6] Advertising for employees stating a prefer-

---

6. Those sections read:

§ 623. *Prohibition of age discrimination—Employer practices*

(a) It shall be unlawful for an employer—

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or

(3) to reduce the wage rate of any employee in order to comply with this chapter.

*Employment agency practices*

(b) It shall be unlawful for an employment agency to fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of such individual's age, or to classify or refer for employment any individual on the basis of such individual's age.

*Labor organization practices*

(c) It shall be unlawful for a labor organization—

(1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his age;

(2) to limit, segregate, or classify its membership, or to classify or fail to refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employ-

ence for a certain age of a person is also prohibited by the Act. 29 U.S.C. § 623(e). Congress, however, also realized that valid decisions in hiring and discharge may provide a defense to a charge of an arbitrary discriminatory employment practice based on age. In part, an employer, employment agency, or labor organization's employment action is not a violation of the Act if "age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business," [7] "where the differentiation is based on reasonable factors other than age," [8] or when the allegedly discriminatory action is "to discharge or otherwise discipline an individual for good cause." [9]

██ The remedies of the Act are basically described in two sections. Section 626(b) provides in part:

(b) The provisions of this chapter shall be enforced in accordance with the powers, remedies, and procedures provided in sections 211(b), 216 (except for subsection (a) thereof), and 217 of this title, and subsection (c) of this section. Any act prohibited under section 623 of this title shall be deemed to be a prohibited act under section 215 of this title. Amounts owing to a person as a result of a violation of this chapter shall be deemed to be unpaid minimum wages or unpaid overtime compensation for purposes of sections 216 and 217 of this title: *Provided,* That liquidated damages shall be payable only in cases of willful violations of this chapter. In any action brought to enforce this chapter

the court shall have jurisdiction to grant such legal or equitable relief as may be appropriate to effectuate the purposes of this chapter, including without limitation judgments compelling employment, reinstatement or promotion, or enforcing the liability for amounts deemed to be unpaid minimum wages or unpaid overtime compensation under this section.

Unpaid minimum wages and unpaid overtime compensation referred to in the above section and in 29 U.S.C. § 216(b) has appropriately been interpreted by the District Court in Monroe v. Penn-Dixie Cement Corporation, 335 F.Supp. 231, 234–235 (N.D.Ga.1971) (footnotes omitted), in a discharge case, to mean "the difference between the value of the compensation by way of salary together with other specific monetary benefits, such as increased pension benefits which would have vested prior to trial, to which plaintiff would be entitled had he remained employed by defendant until the trial date and the value of his total benefits and earnings at other jobs from his discharge until the trial date." Of course, in a case as this when the alleged discriminatory action is the refusal to hire, the damages would be computed with the following changes. In such a case, the damages would be the difference between what the applicant would have received in specific monetary benefits prior to trial had he been hired less whatever he received in wages if he secured employment.[10] Specific questions concerning damages or other relief are within the equitable discretion of the

---

ment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's age;

(3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section.

7. 29 U.S.C. § 623(f)(1); *accord, First Fed. Sav., supra,* 455 F.2d at 820; Stringfellow v. Monsanto Company, *supra,* 320 F.Supp. at 1179.

8. 29 U.S.C. § 623(f)(1).

9. 29 U.S.C. § 623(f)(3). Section 626(f)(2), concerning seniority systems, was interpreted in Hodgson v. American Hardware Mutual Insurance Company, 329 F.Supp. 225 (D.Minn.1971).

For a discussion of other cases interpreting the Act and not widely reported and a general view of the Act, *see* H. Callahan and C. Richardson, Protecting the Older Worker, 6 J.Law Ref. 214 (1972); Annot., 29 A.L. R.3d 1407 (1970).

10. *First Fed. Sav., supra,* a "refusal-to-hire" case, allowed recovery of back wages, but did not describe what they would be.

district court pursuant to 29 U.S.C. § 626(b) and must await future resolution from the courts. Also, since ADEA incorporates 29 U.S.C. § 216(b) pursuant to 29 U.S.C. § 626(b), the district court "shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." 29 U.S.C. § 626(b); *accord,* Monroe v. Penn-Dixie Cement Corporation, *supra* at 235–236 (attorney's fees and costs would have been allowed if plaintiff had received a judgment).[11]

■ We turn now to the specific major issue in this case. The Secretary argues that the efforts of his compliance officer through the two personal meetings and one telephone call constituted substantial compliance with the voluntary compliance requirement of the Act. We disagree.

An integral part of the Act is the express provisions allowing the employer or other organization the opportunity to voluntarily comply with its provisions before legal action is initiated. The introductory Congressional findings and purposes set the spirit and standard to be followed in achieving the enacted goals. Section 621(b) reads in part: "It is therefore the purpose of this chapter * * * to help *employers and workers* find ways of meeting problems arising from the impact of age on employment." (emphasis added). To achieve the goal of eliminating discriminatory employment practices in relation to age, the Secretary's duties should be seen as aiding not only the worker in gaining or maintaining employment, but also the employer in fulfilling his obligations under the law. In this period in our nation in which governmental regulations permeate many facets of previously unregulated activity, government officials must approach their service with a spirit and an attitude of helpfulness and concern for all persons with whom they deal and not with ambiguity, nonchalance, and heavy-handedness of an all-pervasive federal bureaucracy.

■ The Act expressly provides for giving the employer or other organization the opportunity to voluntarily comply with the requirements of the Act. Section 626(b) reads in part:

Before instituting any action under this section, the Secretary shall attempt to eliminate the discriminatory practice or practices alleged, and to effect voluntary compliance with the requirements of this chapter through informal methods of conciliation, conference, and persuasion.

The legislative history of the Act strongly indicates that conciliation, conference, and persuasion must constitute strong, affirmative attempts by the Secretary to effect compliance before resorting to legal action. The House Report makes this clear by stating:

It is intended that the responsibility for enforcement vested in the Secretary by section 7, be *initially and exhaustively* directed through informal methods of conciliation, conference, and persuasion and *formal methods applied only in the ultimate sense.* (emphasis added).

H.R. No. 805, 90th Cong., 1st Sess., U.S. Code Cong. & Admin.News pp. 2213, 2218 (1967).

From that language and the express provisions of the Act, the Secretary must initially use exhaustive, affirmative action to attempt to achieve conciliation before legal action is begun. In

---

11. The District Court in *Stringfellow* ambiguously stated:

It should be noted that the Act makes no provision for the imposition of attorney's fees. It provides specifically that liquidated damages shall be payable only in cases of willful violation thereof.

Stringfellow v. Monsanto Company, *supra,* 320 F.Supp. at 1181. In that case, the plaintiff was unsuccessful in establishing a violation of the Act, and we interpret that above statement to mean that a plaintiff is not entitled to receive attorney's fees and costs when no judgment has been entered for the plaintiff. If judgment is entered for the plaintiff, attorney's fees and costs are recoverable. 29 U.S.C. §§ 216(b) and 626(b).

the fiscal year of 1971, the Wage and' Hour Division of the Department of Labor reached agreements through conciliation with 90 per cent of the 2,522 establishments found in violation of the Act. H. Callahan and C. Richardson, Protecting the Older Worker, 6 J. Law Ref. 214, 225 (1972). Obviously the Secretary strongly recognizes the enacted obligation to conciliate and has been largely successful in his efforts. Also during the calendar year 1971, fifty suits under the Act were filed, eight of which were dismissed due to parties' stipulations to comply to certain agreements. H. Callahan and C. Richardson, *supra* at 226. Although the availability of and resort to courts allow for a method of resolving conflicts, the framework of a free people and the functioning of their government depends not essentially upon the courts, but upon the desire of the people to agree within the framework of their law and to compromise the differences outside the walls of a courtroom. The voluntary compliance provisions recognize this principle and also wisely perceive that conciliation is a difficult process in which exhaustive, affirmative action, in this situation initiated by the Secretary, is demanded to achieve resolution without the necessity of legal action.

In this case, we think that the compliance officer did not fulfill. the affirmative burden of exhaustively employing informal methods to allow the Employer the opportunity to comply voluntarily with the Act. Instead of actively pursuing resolution of the conflict, the Secretary let the case lay dormant for almost four months and filed this present action. Specifically, we affirm the District Court's finding that the compliance officer improperly did not inform the Employer that "back wages" should be paid to Prichard.[12]  In order for the

Employer to comply voluntarily with the Act, he must know specifically what the Secretary desires him to do in order to reach that result. Persuasion cannot be accomplished if the desired goal is unknown. The Secretary by not informing the Employer that back wages are recoverable under the Act and by later instituting a law suit for such damages is defeating the very purpose of attempting to persuade the Employer to comply with the Act. The Secretary's desires and the requirements of the Act should be clearly explained to the employer or alleged violator.

Although the record shows conflicting testimony on whether the compliance officer directly informed the Employer that the file "was being referred for review,"[13] we think that the District Court's finding that the compliance officer did not clearly and affirmatively tell the Employer that the file was in fact being referred to the Secretary for review and possible legal action is not clearly erroneous. The District Court succinctly and perceptively held that "[v]oluntary compliance through conciliation, conference, and persuasion is more likely to be effected when the employer clearly understands that the matter will proceed at a level beyond that of the compliance officer if there is not a voluntary resolution of the dispute."

We further hold that the District Court correctly held that the Employer should have been given the opportunity to respond, at least orally, to the violations in light of a "make whole" remedy.

Although the District Court did discuss the compliance officer's conciliation attempts in relation to the standards announced in the Secretary's handbook for conciliation officers, which was admitted into evidence as a joint exhibit of the parties, it is not entirely clear from the

12. The Secretary argues on appeal that "it requires an unusual degree of credulity to believe that the three conversations in question ran their course without the compliance officer's having requested the manager to 'make whole' the individuals involved." The

record clearly states otherwise. Chleborad clearly testified that "[b]ack wages were not discussed" during the investigation and conciliation attempts. Appendix at 73.

13. See footnote 4, *supra,* and text accompanying footnote 4.

decision whether the District Court thought that the provisions of the handbook itself are binding regulations that must be followed by the Secretary.[14] Stated in other words, does a violation of the handbook provisions constitute a *per se* violation of the Act concerning conciliation attempts? We generally agree with the Secretary that "[c]onciliation is notably an assignment to be played by ear" for "it requires flexibility and responsiveness to the attitudes of the other participants and to the developing positions taken by them in conversations." In this regard, courts would be unwise to hold the Secretary to rigid positions announced in the handbook as guidelines for the compliance officers. Handbooks should be ideally written to allow for far-reaching guidelines to implement enacted provisions. In short, there should be a measure of safety written into the procedures to be followed. Courts would also lack prudence to dictate to the Secretary exactly how to perform his duties, which are expressly within the expertise of the Secretary and his department. Our decision affirms the conclusions reached by the District Court, not because the conciliation officer failed to abide by the rules of the handbook, but rather, we think, the statute itself required at least the performance of the affirmative actions by the Secretary to eliminate discriminatory practices and effect voluntary compliance through conciliation and persuasion that were described herein, but not attempted in this case.

■ The Government correctly argues that the handbooks cannot have the force or effect of regulations that are binding upon the Secretary. These handbooks are very similar to the handbooks in Hawkins v. Agriculture Stabilization and Conservation Committee, 149 F.Supp. 681 (S.D.Tex.1957), in which the court noted that the handbooks were not published in the Federal Register, were not intended by any government officials to have the force and effect of law, and were only guidelines for government personnel. That rationale applies here. In addition, since the handbook was the joint exhibit of the parties, the Government does not argue on appeal that its admission was prejudicial error.

■ The Secretary last submits that the District Court should not have denied all relief, but "should have stayed the proceedings to permit the Secretary to make necessary additional efforts toward effecting voluntary compliance." The Employer argues that the statutory directives are a condition precedent to the court entertaining jurisdiction of the legal action. We think the District Court would have had the power to order this under § 626(b). However, we think that § 626(b) invests a broad discretion in the District Court "to grant such legal or equitable relief as may be appropriate to effectuate the purposes" of the Act. We cannot say that the District Court's failure to grant a stay of the proceedings was an abuse of discretion, particularly in light of the express statutory provision of the Act requiring conciliation attempts before instituting legal action.

Judgment affirmed.

---

14. The Secretary has prepared a handbook for conciliation officers to aid them in the implementation of ADEA and several other federal labor acts. Pages are altered and inserts added on a continual basis. After enactment of ADEA, provisions relating to that Act were added as an appendum to the handbook, which already was in use for implementing other acts.