U. S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,

v.

AIR LINE PILOTS ASSOCIATION, INTERNATIONAL and Northwest Airlines, Incorporated, Defendants.

No. Civ. 3–79–635.

United States District Court,
D. Minnesota,
Third Division.

May 28, 1980.

Thomas Nelson, Frances H. Assa and Lloyd B. Zimmerman, Milwaukee, Wis., for plaintiff EEOC.

James Abbott and Steven D. Wheeler, Minneapolis, Minn., for defendant Northwest Airlines.

Robert Atmore, Minneapolis, Minn., and Michael B. Abram and Jay P. Levy-Warren, New York City, for defendant Air Line Pilots Assn.

## MEMORANDUM AND ORDER

DEVITT, Chief Judge.

At issue in this Age Discrimination in Employment Act (ADEA) case is the validity of a union contract provision that allegedly gives age 60 pilots for Northwest Airlines less favorable vacation benefits than younger pilots. The case was tried to the court during the week of May 12, 1980. Plaintiff is the Equal Employment Opportunity Commission, suing on behalf of Northwest Airline Pilots entering their year of normal retirement, age 60.[1] Defendants are Northwest Airlines, Inc. (NWA), the employer, and the Air Line Pilots Association (ALPA), the union. After hearing the evidence, including numerous stipulated facts, the court determines that the contract provision does violate the ADEA and that appropriate relief, detailed below, should issue.

### FACTS

Under the vacation system in effect for NWA pilots, vacation earned in one year is taken during the following year. Pilots are

---

1. The validity of the age 60 retirement date, which is mandated by federal regulations, is not at issue in this case.

required to bid in November for vacations to be taken during the following year. Thus, for example, vacation earned in 1980 is taken in 1981, and pilots must bid for that vacation time in November of 1980.

During 1978 the defendants negotiated a collective bargaining agreement for NWA pilots, which became effective January 1, 1980, replacing an earlier agreement entered into in 1975. Under the 1975 agreement pilots entering their normal retirement year—the year they turn age 60— could bid all of their vacation time for after their retirement and thereby obtain lump sum payments for all accrued vacation time upon retirement. Pilots retiring prior to age 60 could do the same, provided they exercised sufficient aforethought and planned their retirement prior to November of the previous year, when vacation times were bid for the following year.

Under the 1978 agreement, at issue here, pilots at normal retirement can no longer receive lump sum payments for all accrued vacation time at retirement. Rather, those pilots are required by § 7(B)(1) of the agreement to bid a portion of their accrued vacation time prior to retirement. Section 7(B)(1) requires age 60 pilots to take, prior to retirement, the portion of their vacation earned during their 59th year equivalent to the amount of vacation they will accrue prior to retirement during their 60th year.[2] However, § 7(B)(1) does not alter the ability of pilots retiring prior to age 60 to obtain lump sum payments for all accrued vacation time. Thus, § 7(B)(1) of the 1978 contract requires only age 60 pilots, not early retirees, to take a portion of their accrued vacation time prior to retirement.

## DISCUSSION

*Liability*

■ The EEOC's age discrimination claim is based on the theory that § 7(B)(1) of the 1978 collective bargaining agreement between NWA and ALPA violates the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–34 (1976). Plaintiff appears to assert two distinct violations of the ADEA: (1) that § 7(B)(1) is illegal because it provides age 60 retiring pilots with less lump sum vacation pay benefits than they received under the 1975 contract; and (2) that § 7(B)(1) is illegal because it provides age 60 retiring pilots with less lump sum vacation pay benefits than younger retiring pilots. The first claim will be disposed of summarily. The Eighth Circuit Court of Appeals has made clear that the ADEA does not require that older employees receive preferential treatment over younger employees. *See Cova v. Coca-Cola Bottling Co.*, 574 F.2d 958, 960 (8th Cir. 1978). Therefore, it is irrelevant whether older employees receive lesser benefits than in the past; the relevant inquiry rather is whether older employees receive lesser benefits than younger employees, and if so, why. This inquiry is the subject of the EEOC's second alleged violation and it is addressed below.

■ Under the law of this Circuit, analysis of an ADEA case is a three part process. First, the plaintiff must establish a prima facie case. Second, if a prima facie case has been established, the defendant must show that the apparent discrimination is based on reasonable factors other than age. Finally, if the defendant is successful in rebutting plaintiff's prima facie case, the plaintiff still can prevail if plaintiff proves that age was a contributing factor in the adverse employment decision. *See Cova, supra*, at 959–60; *Moses v. Falstaff Brewing Corp.*, 550 F.2d 1113, 114–15 (8th Cir. 1977).

■ To establish a prima facie case the following must be proved by the plaintiff: (1) the complaining employees are within the protected age group; (2) those employees are affected by an adverse employment decision; and (3) younger employees simi-

---

**2.** For example, a senior pilot might accrue 44 vacation days per year. If his normal retirement date is July 1, 1980, he would have 44 days accrued from 1979 and 22 from 1980. The 1979 days would be taken in 1980, and under § 7(B)(1) the pilot would be required to bid 22 of those days prior to July 1980.

larly situated are not subject to the adverse employment decision. *Compare Cova, supra,* at 959; *Marshall v. Roberts Dairy Co.,* 572 F.2d 1271, 1272 (8th Cir. 1978).[3] The court is satisfied that a prima facie case has been established. The retiring pilots obviously are within the protected age group; those pilots cannot obtain a lump sum payment for all accrued vacation at their retirement date; and younger pilots who decide to retire early can, if they plan their early retirements sufficiently in advance, obtain a lump sum payment for all their accrued vacation at their retirement.

Defendants have argued vigorously that the EEOC has not established a prima facie violation of the ADEA. They argue that if the 1978 agreement is looked at as a whole, retiring pilots actually receive greater benefits than younger pilots. Thus, defendants assert, the court must look at the "total package" of vacation benefits, and the parties have stipulated that under the "total package" approach older pilots as a rule are better off than younger ones.

The court cannot subscribe to defendants' total package argument. The ADEA prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1) (1976). Section 7(B)(1) of the 1978 collective bargaining agreement is a term of employment, and if it discriminates based on age it cannot be justified on the basis that some other term of employment grants older employees special benefits. To so hold would, in the court's opinion, be contrary to the liberal policies underlying the ADEA. See 29 U.S.C. § 621 (1976).

Once a prima facie case has been established the burden shifts to the defendants to show that the adverse employment decision was "based on reasonable factors other than age." 29 U.S.C. § 623(f)(1) (1976). Recent analogous Eighth Circuit case law under Title VII has made clear that this is

more than merely a shift in the burden of producing additional evidence. Rather, the defendants must prove by a preponderance of the evidence that the adverse decision was based on reasonable factors other than age. *Cf. Vaughn v. Westinghouse Electric Co.,* 620 F.2d 655, at 659 (8th Cir. 1980).

In attempting to meet this burden, the defendants have cited three different factors unrelated to age, which allegedly were the reasons for enacting § 7(B)(1): (1) to equalize the ability of older and younger pilots to bid for prime vacation time; (2) to equalize lump sum payments available to all age 60 pilots; and (3) to eliminate the alleged prime abusers of vacation benefits, age 60 pilots. While each of these factors is plausible in the abstract, the defendants have not proved by a preponderance of the evidence that these "legitimate reason[s] exist factually." *Id.*

The first asserted justification is difficult to understand. Apparently defendants argue that under the 1975 contract age 60 pilots generally were bidding all their vacation time after their retirement dates in order to maximize their lump sum payments, and that as a consequence prime vacation times were being bid by retiring pilots who never intended to use those vacation times. As a result, claim defendants, younger pilots with lower vacation bidding rights were being forced to take their vacations at less favorable times, because retiring pilots were bidding for prime vacation slots that they never would use. This argument simply cannot withstand scrutiny. If this problem was a real one, and defendants have presented no credible evidence that it was, it could have been solved simply by allowing younger pilots also to bid for vacation times already taken by retiring pilots, since it would be obvious to the employer that retiring pilots would never use those vacation times but merely were bidding for them to maximize their lump sum payments

---

**3.** The *Cova* and *Marshall* cases, as is true of most ADEA cases, dealt with job termination, not alleged discrimination with respect to terms of employment. Consequently, the standard for a prima facie case has been modified to reflect the differing fact situation. *See e. g., Moses, supra,* at 1114 ("the proof required for a prima facie case of discrimination will vary depending upon the specific factual situation").

at retirement. Therefore, the court cannot accept this as a legitimate nondiscriminatory factor rebutting plaintiff's prima facie case.

The second alleged justification for § 7(B)(1) is that its purpose merely is to equalize lump sum payment amounts for all age 60 retiring pilots. Under the old contract the maximum lump sum payment each age 60 pilot could receive at retirement varied depending upon when that pilot's birthday fell during the year. For example, a pilot retiring on July 1, 1979, who sought to maximize his lump sum payment for accrued vacation time, would receive payment for one full year of vacation time accrued from 1978, plus one-half year of vacation for January–June 1979. A pilot retiring on May 1, 1979, however, would receive less, while a pilot retiring on August 1, 1979, would receive a greater lump sum. Under new § 7(B)(1) age 60 pilots are required to take a portion of accrued vacation prior to their retirement, equal to the amount of vacation expected to be earned during their year of retirement. Thus, the most retiring pilots can receive as a lump sum is one year's worth of vacation, and all age 60 pilots can receive that amount. This, defendants claim, is a laudable nondiscriminatory purpose § 7(B)(1) was intended to serve.

The court is not persuaded that this second asserted justification has any basis in fact. There was no evidence presented by defendants that they received complaints from some age 60 pilots who felt mistreated and wanted the lump sum payments equalized. Indeed, the evidence is to the contrary; age 60 pilots as a group appear to oppose § 7(B)(1) and want to return to the provisions of the 1975 contract. Thus, the court concludes that this second justification is a manufactured one developed after the fact to justify the new provisions of the 1978 contract.

The final justification presented by defendants is simple and has more appeal than the previous two. The premise of this justification is that vacation time is meant to provide rest and relaxation to working employees, not to increase compensation. Therefore, the practice of granting lump sum payments under the 1975 contract was an abuse of the vacation concept. The only group that regularly and predictably abuses vacation time in this manner is age 60 pilots, since younger pilots cannot obtain lump sum payments for accrued vacation unless they retire, and early retirements are rare, unpredictable, and sporadic. Thus, § 7(B)(1) is designed to correct an abuse and it is narrowly drafted to encompass only those employees who abuse their vacation rights—age 60 pilots.

The appeal of this third justification, however, vanishes quickly when it is realized that the union, not the employer, proposed § 7(B)(1) and has defended it most staunchly, and that the employer, NWA, is neutral as to whether the provision remains in the contract. If NWA had proposed the revision then this justification would have an air of credibility, for an employer legitimately might be concerned with abuses in the use of vacation resulting in disguised increases in compensation. However, it is difficult to see why the union, ALPA, should have a similar concern. The availability of lump sum payments to retiring pilots was, in effect, an extra benefit available to those pilots obtained at no expense to the rest of the pilot group. The union, in an adversary position from the employer during the bargaining process, presumably would have no reason to be concerned with whether vacation benefits were being used by one group of union members to obtain additional compensation at the expense of the employer, unless this practice resulted in detriment to other union members. Indeed, the union presumably would be pleased that it could provide such an option to some of its members if there was no cost to other members. Consequently, the court cannot accept the assertion that the union's purpose in proposing § 7(B)(1) was the correcting of "abuses" in the use of vacation time by some of its members.

■ Because the defendants have not shown by a preponderance of the evidence that § 7(B)(1) was enacted for reasons unre-

lated to age, plaintiff's prima facie case stands and it is not necessary to proceed to the third step in the analysis and determine whether age was a contributing factor in the decision to enact § 7(B)(1). *Cf. Vaughn v. Westinghouse Electric Corp., supra,* at 660. If this third issue were to be reached, however, the court has no doubt that it would find age was a contributing fact in the decision. Given the weakness of the justifications offered by defendants, the only reasonable inference that can be drawn from plaintiff's prima facie case is that the purpose of § 7(B)(1) was to force age 60 pilots to take their vacations prior to retirement, thus opening the lucrative senior pilot positions for younger pilots at an earlier point in time.[4] *See* Id. at 660, n. 4.

*Relief*

Having determined that the ADEA has been violated, the issue remaining is that of appropriate relief. The most obvious relief is injunctive, enjoining the enforcement of § 7(B)(1) by defendants, and the parties all appear to assume without argument that this relief will issue, which it hereby does. The issue contested by the parties is the availability of backpay for age 60 pilots who were precluded by § 7(B)(1) from maximizing their lump sum payments at retirement. Since the 1978 contract only went into effect on January 1, 1980, the number of age 60 pilots affected by § 7(B)(1) is not large. NWA has agreed to remedy where possible the effects of § 7(B)(1) on age 60 pilots who have not yet retired or taken their vacations this year. This leaves only seven pilots who arguably have suffered monetary loss as a result of § 7(B)(1):

Buergel, Adamek, Koskovich, Render, Stahl, Twito, and Lemley. As to these seven the parties have stipulated as to the number of vacation days lost and the value of those days. The only remaining issues are whether certain so-called "slot" days should be included, and the allocation of responsibility for payments between the two defendants.

The "slot" days issue concerns confusion that arose as to the operation of § 7(B)(1). Under the collective bargaining agreement age 60 pilots retire at the end of the month of their sixtieth birthday, but they are forbidden by federal law to fly after their sixtieth birthday. Consequently, § 7(B)(1), even if valid, permits age 60 pilots to bid some of their vacation between their sixtieth birthday and the end of the month, thus maximizing their lump sum payments. These days have been referred to by the parties as "slot" days.

The evidence at trial indicates age 60 NWA pilots stationed in Minneapolis did not know they could maximize their lump sum payments by bidding their vacations for the slot days. These pilots apparently were misled by a memo sent to them by NWA explaining § 7(B)(1). The memo explains that under § 7(B)(1) age 60 pilots must bid part of their vacations prior to their retirement date, but then it implies that the retirement date is their birthday, not the end of the month of their birthday. This memo apparently caused Minneapolis pilots not to bid during their slot days.

Defendants have argued that the failure to bid slot days was not a result of any violation of the ADEA, but rather was, if

---

4. To reach this conclusion it would not be necessary to consider certain evidence presented at trial and objected to by defendants. This evidence principally is from discussions that occurred during the course of conciliation efforts by the EEOC, and it probably is inadmissible under Fed.R.Evid. 408. Other evidence of illegal purpose objected to by defendants included an affidavit by a Mr. Erskine, Vice President for Labor Relations for NWA. This evidence also is not necessary for the court to conclude that age was a contributing factor. The defendants, particularly ALPA, have objected strenuously to this evidence since it is

direct evidence that the real purpose of § 7(B)(1) was a purpose that violates the ADEA: the early promotion of younger pilots at the expense of older ones. Defendants apparently believe that without such direct evidence no violation of the ADEA can be found. This belief, however, ignores the fact that reasonable inferences can be drawn from less direct evidence of illegal purpose, such as the inferences that arise from the prima facie case itself. Furthermore, counsel for defendants, at an earlier preliminary injunction hearing, admitted the purpose of § 7(B)(1) was to allow for earlier promotion of younger pilots.

anything, a result of mismanagement of the union contract, which should be remedied by the grievance procedures provided for by the contract. The court cannot agree. The court has determined that § 7(B)(1) violates the ADEA. The lost compensation resulting from the failure to bid slot days and the misleading memo would never have occurred if the illegal provision had not been enacted. Therefore, this lost compensation was a consequence of the enactment of § 7(B)(1), and since this loss was in the nature of lost wages it is compensable under the ADEA. *See Brennan v. Ace Hardware Corp.*, 495 F.2d 368, 373 (8th Cir. 1974).

The second issue with respect to remedies is the allocation of responsibility between the defendants with respect to payment of the monetary awards for lost compensation. Defendant union argues that NWA alone is responsible. This argument is based on § 626(b) of the ADEA, which provides in effect that the remedies under the Act shall include remedies available under the Fair Labor Standards Act, and further that damages awarded under the ADEA "shall be deemed unpaid minimum wages or unpaid overtime compensation for purposes of [applying the FLSA to ADEA cases]." From this ALPA argues that the case law under the FLSA controls allocation of damages between employer and union, and that under the FLSA the employer is solely responsible for payment of unpaid minimum wages or overtime compensation. *See, Brennan v. Emerald Renovators, Inc.*, 410 F.Supp. 1057, 1060–61 (S.D.N.Y.1975).

While ALPA's position is not wholly without merit, the court is of the view that the reference in § 626(b) to the FLSA should not be construed so as to relieve a union from liability for its violations of the ADEA. Indeed, the very language of § 626(b) suggests this. After referring to the FLSA, § 626(b) provides that "[i]n any action brought to enforce this chapter the court shall have jurisdiction to grant such legal or equitable relief as may be appropriate to effectuate the purpose of this chapter." It would not effectuate the purposes of the ADEA to allow unions to violate the Act without having to be concerned with being held liable for any resulting monetary damages.[5]

■ Because the case law under the ADEA is barren on the issue of allocation of responsibility between employer and union for damages resulting from a discriminatory union contract provision, analogous case law under Title VII provides helpful assistance. That case law makes clear that union as well as employer can be held liable for backpay awards. *See e. g., Donnell v. General Motors Corp.*, 576 F.2d 1292, 1300 (8th Cir. 1978); *Allen v. Amalgamated Transit Union Local 788*, 554 F.2d 876, 881 (8th Cir. 1977); *Hardison v. TWA*, 527 F.2d 33, 43 n.14 (8th Cir. 1975) (dictum); *Rogers v. International Paper Co.*, 526 F.2d 722, 723 (8th Cir. 1975). The Eighth Circuit in *Rogers, supra*, gives some guidance as to allocation of responsibility. The court in *Rogers* remanded with instructions for the district court to determine "the amount, or percentage of the total, each of the defendants [employers and union] shall be required to contribute to the [backpay] award." 526 F.2d at 723. The Fifth Circuit expanded on the allocation problem in *Parson v. Kaiser Aluminum & Chemical Corp.*, 583 F.2d 132, 133–34 (5th Cir. 1978):

The Union objects to the suggestion in our original opinion, *see* 575 F.2d [1374] at 1389, that if upon remand the District Court finds the *prima facie* illegal transfer system to fail the "business necessity" justification, the Union must share liability for the Title VII violation and contribute to any monetary relief. Although our view is that the Union has a major operational responsibility for the transfer rules established by the collective bargaining agreement, we have previously approached the attribution of liability

---

**5.** It should be noted that ALPA has cited the court to nothing in the legislative history of the ADEA suggesting unions should be immune from damages liability, and the court also has found no such indication in the Act's legislative history or in any case law under the Act. *See generally* [1967] U.S. Code Cong. and Admin. News, pp. 2213–27.

and the apportionment of damages as between employer and union on a flexible basis with regard to the comparative equities, [citations omitted], and we do not mean to foreclose the District Court's discretion in this regard.

◼ Thus, this court must exercise its reasoned discretion and allocate responsibility for payment of damages based on the comparative equities.

In allocating damages, the court has considered the two basic types of damages separately. The first type is the lost compensation resulting directly from § 7(B)(1),[6] and the second type is the lost compensation resulting from the so-called "slot days" problem, described earlier.[7] The first type is, in the court's view, primarily the responsibility of ALPA, since ALPA proposed § 7(B)(1), advocated strongly for its incorporation into the 1978 agreement, and refused to conciliate once the claim of age discrimination was made.[8] NWA, however, also must bear some responsibility, for it agreed to § 7(B)(1) and acquiesced in the pressures brought to bear by ALPA during negotiation of the 1978 contract. Weighing the equities the court determines that ALPA should pay for 75 percent of these damages and NWA for 25 percent.

The second type of damages, relating to the slot days, stand on different footing. These damages were the result primarily of the misleading memo sent to age 60 pilots by NWA explaining the mechanics of § 7(B)(1). Thus, NWA's actions were the immediate cause of these damages. In a broader sense, however, these losses would never have occurred if ALPA had not proposed and insisted upon the approval of § 7(B)(1) by NWA. On the whole the court views the equities to be about equal as to these damages and therefore both defendants should pay 50 percent.

The above discussion should be sufficient, in light of the stipulations agreed to by the parties, to determine the amount of damages each complaining pilot should receive and the amount each defendant should pay. The parties are directed to embody such computation in an Order for Judgment for the court's signature. If the need be, the parties may move the court for further instructions.

## CONCLUSION

The clerk of court is directed to enter judgment for plaintiff. Defendants are enjoined from enforcing § 7(B)(1) of their 1978 collective bargaining agreement and are ordered to pay damages in accordance with the principles enunciated above.

◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼

---

**6.** The following pilots have suffered this type of loss: Adamek (7 days); and Stahl (16 days).

**7.** The following pilots have suffered this type of loss: Buergel (6 days); Koskovich (3 days); Render (7 days); Stahl (2 days); Twito (3 days); and Lemley (11 days).

**8.** ALPA objects to the admission of evidence with respect to the EEOC's conciliation attempts with ALPA, citing Fed.R.Evid. 408. Rule 408, however, only excludes evidence obtained from settlement negotiations if the evidence goes to the issue of liability. Here the evidence is relevant to the issue of allocation of damages, not liability. Therefore, Rule 408 is inapposite.