**George C. COATES, Plaintiff,**

v.

**NATIONAL CASH REGISTER COMPANY, Defendant.**

**Woodie L. SMITH, Plaintiff,**

v.

**NATIONAL CASH REGISTER COMPANY, Defendant.**

Civ. A. Nos. 75–0094, 75–0095.

United States District Court, W. D. Virginia.

July 1, 1977.

Gary L. Bengston, Danville, Va., for plaintiffs.

C. Stuart Wheatley, Clement, Wheatley, Winston, Ingram & Majors, Danville, Va., Donald B. Harden, Fisher & Phillips, Atlanta, Ga., for defendant.

## OPINION

GLEN M. WILLIAMS, District Judge.

After having complied with the administrative procedures under the Age Discrimination in Employment Act (ADEA), as amended, 29 U.S.C. §§ 621 et seq., the plaintiffs filed these cases in this court on November 20, 1975, alleging violations of the ADEA. They contended that their discharges from employment with the National Cash Register Company (NCR) on May 2, 1975 were improperly based upon their ages. The company asserted that their dis-

charges were motivated by factors other than age.

By agreement of counsel, the court consolidated these two cases for trial and ordered the impanelling of an advisory jury. Trial was held on January 17, 18 and 19, 1977 in the Danville Division of the Western District of Virginia.

In response to special verdict questions, the advisory jury found that both plaintiffs had been discharged at least in part because of their age, but that the discharges were not willful violations of the Act. Consequently, the jury determined that each plaintiff had suffered damages for loss of wages and benefits and for pain and suffering. The court then made its own findings which agreed with the jury's determination.

### Findings of Fact

George C. Coates was fifty years of age at the time of his discharge and had about twenty-two years of service with NCR. Woodie L. Smith was forty years of age at the time of his discharge and had been employed by NCR for about eighteen years. Both had received merit pay increases just prior to their discharges. The branch manager stated that plaintiffs were good employees right up to the day they were discharged.

Both men were employed as field engineers in the Danville office of NCR. Field engineers maintain and repair NCR equipment under maintenance agreements and on a "cash and charge basis". Coates had also performed some supervisory functions, such as assigning and dispatching engineers upon client requests.

NCR conducted training courses on how to service their various types of equipment. Usually a field engineer participated in a training program on a particular machine at the request of NCR. Occasionally an engineer received training he specifically requested. However, all training depended on the need for expertise on a certain machine at the engineer's branch office and on the schedule and size of the training classes.

Certain courses had prerequisites, and a request for training would be denied if the engineer had not had the prerequisite. The basic electricity course was required before an engineer could train on electro-mechanical equipment, and basic electronics was a prerequisite to electronic machines.

At the time of their discharges, Coates was trained on fifteen types of mechanical machines and had almost completed the Basic Electronics Course. He had requested this course as early as 1965 and had received three parts of it at one time but was required to return it before the last part ever arrived.

Smith was trained on sixteen mechanical machines and two electro-mechanical bookkeeping machines. He had also received the Programmed Instruction Basic Electricity Course in 1967 and the Basic Electronic Course in 1975. Smith had requested training on electronic banking machines on numerous occasions since he already serviced most of the mechanical proof machines and knew the customers.

A number of younger men in the Danville office were requested by NCR to take training on electronic machines during the period when plaintiffs were requesting such training. The Danville branch manager during this period stated that the electronic training was given to the younger employees because: (1) they had personally requested it; and (2) certain electronic machines were placed in their respective territories so they needed the training to continue serving their clients. Three employees who had received this training during that period repudiated the testimony of the branch manager. They testified that the company directed or requested them to take the training. Furthermore, they could not recollect any changes in the composition of the machine populations in their territories that would have justified this training.

Training in electronic machines was becoming essential because, by 1975, NCR had phased out the manufacture of all mechanical machines except two. These two were to be phased out soon, leaving only electronic machines being manufactured. Younger men were often chosen for this

training over the older employees because the older men were more experienced and useful to NCR. Even when older men were chosen, their usefulness to the company frequently made it impossible to schedule them for the course.

In late 1974, NCR sent out a confidential memorandum to all district managers. The memorandum dealt with the fact that many field engineers over fifty years of age had not received electronic training. This lack of training was causing morale problems among the older employees. The memorandum ordered the district manager to encourage their older workers to participate in the special training classes to be offered by the company beginning in December, 1974. Unfortunately, the Danville office never fully responded to the directives of the memorandum.

In 1974, the Lynchburg District (of which Danville is a branch office), failed to meet its profit budget. The Danville branch had performed worse than any other branch in the Lynchburg district. The Capital Regional Office decided, in conjunction with the Lynchburg office, that eight field engineers would have to be removed from the Lynchburg district. Each branch manager was directed to recommend persons for discharge, based on the criteria of eliminating any "misfits" and keeping only those men needed to service most of the existing machines and all of the new electronic equipment due to arrive.

Since the Danville branch manager did not feel that he had any "misfits", he discharged plaintiffs because they were the only field engineers in the office who had not received training on electronic machines. The Danville branch manager admitted that he would have made another decision if Smith had received electronic training prior to the discharge, and that it was not Smith's fault that he lacked this training. The manager agreed that plaintiffs were among the highest revenue producers in the office. He further conceded that by using the training level as a criteria, he was forced to discharge the two oldest men in the office while keeping on one man who was not qualified to work on 85% of the machines in the Danville area and another man who was only marginally qualified to service 85% of the machines. As a result of the discharges, NCR lost $1,700 worth of maintenance on a certain kind of machine that only the plaintiffs were trained to service.

The discharges had serious effects on the lives of both plaintiffs. Coates and his wife stopped seeing friends and family because of embarrassment. They had to live on his savings and her salary and were unable to afford vacations. He made numerous inquiries about other jobs but was unable to obtain any regular employment after his discharge.

Smith was unable to sleep and became very unresponsive to his family. While he did obtain other employment, he was forced to work night and day and still earned so little income that his oldest son took a part-time job. The family activities almost ceased. Mrs. Smith did not even attend her mother's funeral because of the lack of money and of her fear of leaving Mr. Smith alone.

On occasions, NCR offered to reemploy plaintiffs as field engineers in other locations. The first offer was made in October, 1975 for a position in the NCR offices in Washington, D. C. and Baltimore. These two offices were considered by field engineers to be the "graveyards" of NCR, so both plaintiffs declined to accept what they considered to be inferior positions. In the summer of 1976, plaintiffs received offers and discovered no openings actually existed. In fact, their inquiries created labor problems in the Hempstead, New York office. The union members there were angered that non-existent positions were being offered to field engineers from another area when their union had been trying to get their own laid-off engineers rehired. Later offers were made, but plaintiffs were understandably skeptical about NCR's intentions and remained adamant in their desire to be rehired in Danville.

Both plaintiffs received two weeks severance pay, a six-month continuation of com-

pany benefits and unemployment compensation. They notified the Secretary of Labor in writing within 180 days of their discharges of their intentions to bring suit against NCR under the ADEA.

## Conclusions of Law

The Age Discrimination in Employment Act was intended, among other things, "to prohibit arbitrary age discrimination in employment". 29 U.S.C. § 621(b) (1975). In deciding whether plaintiffs had been discriminated against because of their age, this court also had to determine whether a jury could be impaneled, what standard should be employed by which to judge the discrimination, what kinds of damages were available to plaintiffs, and whether reinstatement was appropriate. The remainder of this opinion deals with these issues:

### A. *Jury Trial*

■ Over the objection of the counsel for NCR, this court ordered the impaneling of an advisory jury. Since the trial in this case, the right to a jury trial under ADEA has been clarified in the Fourth Circuit. In *Pons v. Lorillard,* 549 F.2d 950 (4th Cir. 1977), the court concluded that ADEA's provision for legal relief renders actions under the Act suits "at common law" under the Seventh Amendment. Thus a plaintiff having a claim for lost wages under ADEA has a right to a jury trial.

Since jury trials have been held appropriate under ADEA, this court's use of an advisory jury was also proper. Under Rule 39(c), *Fed.R.Civ.Proc.;* an advisory jury was impaneled by this court to assist in its decision on all issues. In accordance with Rule 52(a), findings of fact and conclusions of law will be adopted by this court to support the final judgment.

### B. *Standard*

■ Section 623(a)(1) of the ADEA states that it is unlawful for an employer to discharge or to discriminate against any individual "because of such individual's age." The phrase "because of such individual's age" is used several times throughout the prohibitory sections of ADEA and constitutes the standard by which to judge employment decisions. The problem with this standard for courts has been to interpret how much weight age must be given in the employment decision before the Act is violated.

The first court to define this standard was in *Bishop v. Jelleff Associates,* 398 F.Supp. 579 (D.D.C.1974). The court stated that:

> [t]he statute is not violated in the case of termination or other employer decisions which are premised upon a rational business decision made in good faith and not actuated by age bias.

*Id.* at 593. In adopting this formulation, the court quoted from the interpretation by the Labor Department:

> The clear purpose is to insure that age . . . is not the determining factor in making any decision regarding [employment].

29 C.F.R. § 860.103(c) (1972).

The court in *Laugesen v. Anaconda Co.,* 510 F.2d 307 (6th Cir. 1975) adopted a "determining factor" test and explained how the jury should judge the legality of the employment decision:

> [w]e believe that it was essential for the jury to understand from the instructions that there could be more than one factor in the decision to discharge him and that he was nevertheless entitled to recover if one such factor was his age and if in fact it made a difference in determining whether he was retained or discharged. This is so even though the need to reduce the employee force generally was also a strong, and perhaps even more compelling reason.

*Id.* at 317.

In instructions to the advisory jury in this case, the court characterized the standard in two ways: (1) "in whole or in part upon age"; or (2) "one of the reasons for their discharge was their age".[1] These instruc-

---

1. The text in which these phrases are found reads as follows:

tions comport with previous interpretations of the ADEA standard.

NCR had several reasons for its reduction of the Danville field engineers staff, including deteriorating economic conditions in mid-1975. While the company can discharge its employees, it cannot base the decision about which employee to discharge on age or on factors created by age discrimination.

■ NCR's decision to discharge plaintiff was not directly based on age, but it was based on the training of plaintiffs. The evidence clearly established that the relative training levels of NCR employees was directly related to the age of the employees. So by using the training level as the basis of the discharge decision, NCR indirectly discharged plaintiffs because of their age. Therefore this court holds that the training or lack of training, which ostensibly is an objective and valid criterion for employment decisions, cannot form the basis of an employment decision when that lack of training is created by age discrimination. The age discrimination which invalidates an employment decision need not be direct or intentional. This court further holds that both plaintiffs were discharged "because of" their "age".

### Damages

Besides asking for reinstatement, plaintiffs requested back wages from May 2, 1975 until reinstatement, liquidated damages and attorney's fees and costs. To determine the amount of back wages plaintiffs will receive, several factors must be resolved: (1) what is the measure of back wages; (2) whether mitigation of damages is required; and (3) whether offers of reemployment stop the running of the back pay period.

A good statement of the measure of damages for lost wages in ADEA cases is found in *Bishop v. Jelleff, supra:*

> Back pay is measured by the difference between the salary an employee would have received but for a violation of the Act and the salary actually received from other employment less unemployment benefits. The relevant period for measuring back pay begins with the time of the loss of employment as a result of the violation and ends when the affected employee accepts or declines reinstatement.

.    .    .    .    .

398 F.Supp. at 597. While the courts in *Bishop* and in two cases relied on therein, *Schulz v. Hickok Mfg. Co., Inc.,* 358 F.Supp. 1208 (N.D.Ga.1973) and *Monroe v. Penn Dixie Cement Corp.,* 335 F.Supp. 231 (N.D. Ga.1971), recognized that the back pay awards should be reduced by amounts "actually" earned by a plaintiff during the period after his discharge, these courts did not set forth any requirement that a plaintiff make efforts to mitigate damages by seeking other employment.

Title VII of the Civil Rights Act provides that back pay awards will be reduced by "interim earnings or amounts earnable with reasonable diligence." 42 U.S.C. § 2000e–5(g) (1974). In those instances where plaintiffs have not made reasonable efforts to mitigate their damages, the courts have

The Act states that it shall be unlawful for an employer to discharge any individual  .  . because of such individual's age.

The ultimate question  .  .  . is whether the plaintiffs were laid off because of their age.

\*    \*    \*    \*    \*    \*

Under the law, the defendant may lay off or discharge an employee for good cause, poor cause or no cause at all, so long as it is not motivated in whole or in part by the employee's age.

\*    \*    \*    \*    \*    \*

[The Act] allows an employer to operate his business and to make his decision free from any violation of the law, so long as he doesn't base his employment decisions in whole or in part upon age.

\*    \*    \*    \*    \*    \*

If you find by a preponderance of the evidence that the plaintiffs were discharged and that one of the reasons for their discharge was their age, then the plaintiffs are entitled to damages.

\*    \*    \*    \*    \*    \*

In order to prove their claim, the burden is upon each plaintiff to establish  .  .  .  . (3) that one of the reasons that either was discharged  .  .  . was because of age.

reduced their back pay awards by an amount which they could have earned with "reasonable diligence." *See e. g. Jurinko v. Edwin L. Wiegand Co.,* 477 F.2d 1038, 1046 (3d Cir. 1973).

■ In the instructions to the jury and in the special verdict form used by the jury to report its findings, it was clearly stated that any award for back pay should be reduced by an amount which could have been earned with "reasonable diligence". Although this express language was not carried over from Title VII to the ADEA, there seems to be no reason why a plaintiff who suffers from age discrimination should be treated differently with regard to a requirement to mitigate damages than one who suffers from racial discrimination. Accordingly, it is the holding of this court that under the ADEA, an award for back pay must be reduced by an amount which the plaintiff could have earned had he sought alternative employment with "reasonable diligence". The clear similarity between Title VII and the ADEA as recognized by numerous courts, *see, e. g. Hodgson v. First Federal Sav. & L. Ass'n. of Broward County, Florida,* 455 F.2d 818, 820 (5th Cir. 1972), and the discretion granted to the court under ADEA to fashion "appropriate" relief, 29 U.S.C. § 626(b), fully justify this requirement of mitigation.

■ In this case, Smith was able to find employment although it was not compara-ble to his position with NCR. Coates never obtained employment after his discharge, but the evidence shows that he made numerous inquiries about jobs. Therefore, this court finds that both plaintiffs used "reasonable diligence" to mitigate their damages.

Another aspect of the measure of damages is the effect of offers of reemployment on damages. In *Jurinko, supra,* the defendant had made offers of reemployment, and the trial court held that the discrimination ceased as of the date the plaintiffs rejected the offers. The Court of Appeals disagreed, stating that, since the offers did not include back pay or seniority, the effects of the discrimination had not ended.

■ In the instant case, the defendant offered new positions to the plaintiffs but in different locations. This court gave instructions identifying the characteristics of a bona fide offer of reemployment that would stop the running of the back pay period: (1) offer of a position comparable to the former position in terms of status, duties, responsibilities, working conditions, and opportunities for advancement; (2) the offer must be more than a mere promise of a job, *i.e.* the offer must be specific and concrete in its terms, proposed location, fringe benefits, moving expenses, etc.; (3) the rejection of this offer by the plaintiffs must be unreasonable.[2] The advisory jury

2. The full text of these instructions is as follows:

   If you find that the defendant in good faith offered to employ the plaintiffs or either plaintiff in a position comparable to his former position and that the refusal of the plaintiffs or either of them to accept such position was unreasonable, then you must end the award of back pay as of the date of the plaintiffs' unreasonable rejection of the offer; however, if the positions which were offered to the plaintiffs were not comparable positions and if you feel that the plaintiffs' rejection of these offers was reasonable, then the plaintiffs may be awarded back pay for the period from the date of their discharge to the date of this Court's judgment.

   You are instructed that an offer of reinstatement will stop the running of back pay. In determining any back pay award, you may consider only that period from the date of the layoff until the date you find defendant's offers of reinstatement were unreasonably rejected by the plaintiffs.

   An offer of reinstatement is one which returns a laid-off employee to his former status in terms of duties and responsibilities and working conditions. It is not necessary that the employee be returned specifically to his former job, but he must return to his former duties, status and employment conditions. But whether the refusal to accept alternative employment is so unreasonable as to preclude recovery of damages by the improperly discharged employee requires a weighing of many facts and circumstances. Comparability in salary is only one fact to be considered in this connection. Comparability in status is often of far more importance—especially as it relates to opportunities for advancement or for other employment—than comparability in salary. Accordingly, a discharged employee is not required in mitigation of damages, to accept alternative

found that none of the offers made by NCR prior to the verdict was sufficient to stop the running of the back pay period. This court agrees with this finding since many of the offers were for non-existing jobs and could not have been considered bona fide offers made in good faith. Therefore, plaintiffs were justified in not accepting any of the offers.

To summarize the measure of back pay, it is still the difference between the salary an employee would have received but for the violation of the Act and the salary actually received from other employment. The period of back pay is measured from the time of the loss of employment as a result of the violation to the time when the employee accepts or declines reinstatement at his former position or at a position of comparable status, salary, benefits, and potential for advancement. The back pay amount computed in this way must be reduced by severance pay received, unemployment compensation collected, and any amounts earnable with reasonable diligence. Finally, the back pay amount should be increased by the value of any pension benefits, health insurance, seniority, leave-time, or other fringe benefits which the employee would have accrued during the back pay period but for the violation of the Act. *See, e.g. Combes v. Griffin Television, Inc.,* 421 F.Supp. 841 (W.D.Okl.1976).

Another aspect of damages involves damages for pain and suffering. The final amended complaint did not specifically ask for pain and suffering damages, but a memorandum and the jury instructions submitted by plaintiffs asserted that such damages were appropriate. Over defendant's objections, the advisory jury was instructed that it could award damages for emotional distress. Such an award was returned for both plaintiffs.

At the time of the trial, this court relied on a persuasive decision of the District Court of New Jersey allowing an award for pain and suffering under ADEA. *Rogers v. Exxon Research & Engineering Co.,* 404 F.Supp. 324 (D.N.J.1975). Since the trial in this case, the *Rogers* decision has been vacated by the Third Circuit Court of Appeals. *Rogers v. Exxon Research & Engineering Co.,* 550 F.2d 834 (3rd Cir. 1977). The court of appeals believed that an award for emotional distress was inconsistent with the statutory scheme and would cause serious administrative problems.

Since the district court decision in *Rogers,* a number of courts have considered this issue. Two courts, relying on the district court in *Rogers,* concluded that damages for pain and suffering are available under ADEA. *Combes v. Griffin Television, Inc.,* 421 F.Supp. 841 (W.D.Okl.1976); *Bertrand v. Orkin Exterminating Co., Inc.,* 419 F.Supp. 1123 (N.D.Ill.1976). One court recently refused to follow the Third Circuit decision in *Rogers* and allowed pain and suffering damages. *Bertrand v. Orkin Exterminating Co.,* 432 F.Supp. 952 (N.D.Ill. 1977). However, several other courts followed the court of appeals' decision in *Rogers. Looney v. Commercial Union Assurance Co.,* 428 F.Supp. 533 (E.D.Mich.1977); *Hannon v. Continental Nat'l Bank,* 427 F.Supp. 215 (D.Colo.1977).

employment, the inferiority of which might injuriously affect the employee's future career or reputation in his profession, and which would not reactivate all the employee's potential within the firm.

In order for an offer of reemployment to be acceptable, there must be reasonable assurance to the former employee that the proposed job actually exists and is available to the former employee, and there is no duty on the part of the former employee to accept a mere promise of a job, nor is the former employee required to accept a job offer couched in vague terms that leaves his future status, duties and working conditions in doubt.

A distinction must also be made between mere negotiations as to possible job offers, or the promise of a job, and a job offer made in specific terms and conditions so that a person can make an intelligent decision thereon. The job offer must be so specific in its terms that the employee should not have to make a guess as to the intentions of the employer. All of these factors should be weighed by you in determining whether a good faith offer of reemployment has been made in this case, and if so, then you would have to determine when that offer was made in determining question number 2.

Unfortunately, the Act itself does not specifically provide for compensatory damages, but it does give the court power to grant "such legal and equitable relief as may be appropriate to effectuate the purposes of this chapter . . . ." 29 U.S.C. § 626(b) (1975). The phrase "legal and equitable relief" implies that legal damages, including compensatory damages for emotional distress, would be available as long as such damages "were appropriate to effectuate the purposes" of the Act. Contrary to the decision in *Looney, supra,* this court believes that "legal . . . relief" relates to more than the liquidated damages provisions of ADEA and that damages for emotional distress do effectuate the purposes of the Act.

An examination of the opinion of the court of appeals in *Rogers* reveals that the decision is primarily based on a judicial disillusionment with the efficacy of pain and suffering awards in general. But the fact that judges are skeptical of damages for emotional distress should not lead a court to imply a limitation on compensatory damages in a statute which provides for "legal . . . relief . . . without limitation." 29 U.S.C. § 626(b) (1975).

The court of appeals in *Rogers* also believed that pain and suffering awards would frustrate the conciliatory method of enforcement. However, damages for emotional distress have been held available under Titles VII and VIII of the Civil Rights of 1964 and 1968, respectively, even though conciliation is the primary means of enforcement under these Acts. *See, e. g. Jeanty v. McKey & Poague, Inc.,* 496 F.2d 1119 (7th Cir. 1974); *Smith v. Sol D. Adler Realty Co.,* 436 F.2d 344 (7th Cir. 1970); *Humphrey v. Southwestern Portland Cement Co.,* 369 F.Supp. 832 (W.D.Tex.1973), *rev'd on other grounds,* 488 F.2d 691 (5th Cir. 1974), *reh. denied,* 490 F.2d 992 (5th Cir. 1974).

■ Accordingly, it is the holding of this court that damages for pain and suffering are allowable under ADEA. The bases of this holding are the reasons stated in the lower court's decision in *Rogers:* (1) the ADEA, like Title VIII of the Civil Rights Act of 1968 (42 U.S.C. § 3612) creates a new statutory tort, and the existence of such a statutory right implies the existence of necessary and appropriate remedies; (2) the ADEA shares the "make whole" purpose of Title VII of the Civil Rights Act of 1964 and the emotional and psychological losses occasioned by age discrimination were clearly recognized by the Congress in its deliberations on the Act; (3) compensatory awards for pain and suffering have been found appropriate in other discrimination contexts, including employment and housing; (4) the cases denying damage awards for pain and suffering in Title VII actions have been premised on that statute's express limitation of relief to equitable remedies, whereas the ADEA contains a specific allowance of legal relief.

■ Based on the evidence adduced at the trial, this court is in accord with the jury's determination that both plaintiffs suffered damages for pain and suffering. Their discharges disrupted their lives and caused them considerable embarrassment.

Both plaintiffs also prayed for liquidated damages and attorney's fees and costs. Liquidated damages are only available for "willful violations" of ADEA. 29 U.S.C. § 626(b) (1975).

■ In this case, the advisory jury was instructed that they should find that the discharges were willful violations of ADEA only if the acts were "done voluntarily and intentionally, and with the specific intent to do something which is forbidden by law." This court finds that neither discharge was a willful violation of the law; therefore, no liquidated damages are available to plaintiffs.

■ Finally, it is well settled that plaintiffs who are victims of age discrimination are entitled to reasonable attorney's fees and costs. The ADEA incorporates by reference language of the FLSA that allows the court to award attorney's fees and costs to plaintiffs. 29 U.S.C. § 216(b) (1977 Supp.) incorporated by 29 U.S.C. § 626(b). *See, generally Rogers v. Exxon Research &*

*Engineering, supra; Brennan v. Ace Hardware Corp.,* 495 F.2d 368 (8th Cir. 1974); *Chilton v. National Cash Register Co.,* 370 F.Supp. 660 (S.D.Ohio 1974); *Schulz v. Hickok Manufacturing Co., supra.*

█ In determining the amount of the attorney's fees, this court relied on the following factors: "(1) the number of hours the attorney used in preparing and arguing the claim; (2) the novelty and complexity of the case; (3) the skill and preparedness of the attorney; (4) the resulting judgment; and (5) awards in similar cases." *Taylor v. Safeway Stores, Inc.,* 524 F.2d 263, 268 (10th Cir. 1975).

Reinstatement

█ The ADEA specifically provides that a court may compel "employment, reinstatement or promotion." 29 U.S.C. § 626(b) (1975). If this court ordered employment, NCR could conceivably reemploy plaintiffs in any of its offices in the country. As an alternative, this court could order "reinstatement." A review of the cases decided under ADEA and other employment discrimination legislation reveals almost no discussion of the meaning of "reinstatement." The normal definition of this word would clearly justify this court's ordering that plaintiffs be reinstated in their original positions at the Danville office of NCR.

However, national corporations have repeatedly asserted their prerogative of transferring employees at will. But under ADEA, the transfer of an employee to an inferior job or to a less desirable place on account of age is just as discriminatory as the actual discharge on account of age. Therefore, once age discrimination is established, the type of injunctive relief granted must vary according to the facts of each case.

The evidence demonstrated that numerous mechanical machines remained in the Danville area on which plaintiffs could work. Furthermore, plaintiffs indicated they were ready and willing to take training courses so they would be qualified to work on electronic equipment. The evidence did not disclose whether the areas in which the job offers were made contained machines on which plaintiffs were qualified to work.

The advisory jury concluded that the offers of reemployment made by NCR were not good faith, bona fide offers. After carefully reviewing the evidence, this court agrees with the jury and finds that NCR's offers of reemployment were nothing more than transfers predicated on age. For this court to permit reemployment of plaintiffs in uncertain conditions at places other than Danville would be a blank check allowing NCR to continue the discrimination that led to the discharge of plaintiffs. Therefore, this court holds that plaintiffs must be reinstated in the Danville office of NCR.

Based on all of the foregoing findings, this court holds that both plaintiffs were discharged "because of" their "age" in violation of ADEA. The court awards Coates damages of $21,500.00 and damages for emotional distress in the amount of $15,000.00. The court awards Smith damages for lost wages and benefits in the amount of $13,000.00 and damages for emotional distress in the amount of $15,000.00. Although this court initially reduced the jury's finding of lost wages incurred by Smith, reconsideration of the facts has convinced the court that the advisory jury correctly determined the amount of lost wages. Plaintiffs are also awarded attorney's fees in the amount of $14,700.00 and the costs of this action.

Furthermore, this court enjoins NCR to reinstate both plaintiffs in their positions as field engineers in the Danville office, with all benefits, seniority, and job status which would have accrued had the discharges never occurred. Also, NCR is enjoined to place the plaintiffs on an accelerated training schedule so as to place both men at a training level comparable to the younger men in the office and to alleviate the "training obsolescence" suffered by both men as a result of age discrimination. If the economic problems of the Danville office still require a reduction in the number of field

engineers, such a decision must be made taking into account the fully-trained status to be obtained by both plaintiffs as a result of the order of this court.