**Virginia EASTER, Plaintiff,**

v.

**JEEP CORPORATION, Defendant.**

**No. C 71–232.**

United States District Court, N. D. Ohio, W. D.

Jan. 25, 1982.

Wilbur Jacobs, Toledo, Ohio, and Robert Affeldt, Sylvania, Ohio, for plaintiff.

Rolf H. Scheidel, Toledo, Ohio, and Marilyn Shea-Stonum, Cleveland, Ohio, for defendant.

## OPINION AND ORDER

DON J. YOUNG, Senior District Judge.

On June 2, 1981, this Court filed a memorandum and order granting the plaintiff's motion that he recuse himself, and transferring the case to Chief Judge Battisti for re-assignment. Chief Judge Battisti then assigned the case to himself for further proceedings.

On August 31, 1981, plaintiff filed a motion to transfer the case back to the Western Division of the Northern District of Ohio. The defendant opposed the motion. Thereafter, Chief Judge Battisti conferred with counsel, and orally inquired whether this judge would be willing to have the case re-assigned to him, and to dispose of it.

As this judge pointed out at the time he stepped aside, he had no bias at all for or against any of the parties. The matter was just another rather complicated lawsuit to him. He deferred to the rulings of the Sixth Circuit Court of Appeals that a judge must recuse himself if a reasonable person could find that he was biased, because counsel for both parties, who are certainly reasonable, had stated plausible reasons for feeling he was biased. When counsel apparently reconsidered their feelings and reasoning and the Chief Judge asked, in the interest of judicial economy, to return the case to this judge, this judge orally agreed to accept the re-assignment of the case, and thereupon Chief Judge Battisti transferred the case to him. An order doing so was entered October 9, 1981.

Thereafter, the defendant, on November 9, 1981, filed a motion to dismiss pursuant to Rule 37, or in the alternative to reconsider the liability determination pursuant to Rule 60, and, if necessary to reopen the record on the issue of damages.

This motion is opposed by the plaintiff. It must be determined before proceeding further in the case.

Basically, the defendant in its motion asserts that plaintiff was guilty of perjury in her answers to interrogatories, and in her testimony at the damage hearing, concerning her availability for employment and her employment after her discharge by the defendant. Based on plaintiff's alleged perjury, defendant seeks to have the case dismissed either as a sanction for failing to provide discovery, or by application of the equitable doctrine of "clean hands." Defendant argues that a perjuror does not come into equity with clean hands.

Since the defendant is vociferous in its use of the word perjury, it would perhaps be well to consider whether defendant's factual allegations are sufficient to support a charge of perjury. Parenthetically, it should be observed that it is extremely difficult to get convictions for perjury. Prosecutors will almost never prosecute for perjury. In almost forty-nine years at the bar

and on the bench, this judge has only seen one successful prosecution for perjury, although he has encountered innumerable instances where witnesses did not tell the truth under oath.

Perjury is defined by Title 18 U.S.C. § 1621, in part as follows:

"Whoever—

(1) having taken an oath before a competent tribunal, officer or person, in any case in which the law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true;

\*     \*     \*     \*     \*     \*

is guilty of perjury..."

■ Thus, it is not sufficient to establish a charge of perjury merely to show that a sworn statement was not true. The untrue statement must be shown to have been willfully made, that is, "voluntarily and intentionally, and with specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or to disregard the law." [1]

■ Moreover, it must be established that the person making the statement does not believe it to be true. This Court discussed in its findings on the liability issues in this case the problems presented by the problem that both parties believed they or their witnesses were telling the truth when in fact they were not. The matter will be discussed more in detail at a later point in this memorandum. It is sufficient here to say that the defendant at most has shown no more than that some of the plaintiff's statements are not objectively true. It cannot be inferred from that fact alone that the plaintiff believed them to be untrue. Perjury has not been committed unless such belief in untruth is established or admitted. Standard jury instructions state that inno-

1. Devitt & Blackmar, *Federal Jury Practices*         *and Instructions*, [3d ed. 1977] § 14.06, p. 384.

518

cent misrecollection, like failure of recollection, is not an uncommon occurrence. Indeed, it is not, a fact to which this case stands witness.

■ Viewed in the context of the whole case, the time span of the hearings, and the lapse of time from the happening of the events involved to the present time, it is impossible to conclude that the plaintiff is any more a perjuror than many of defendant's witnesses, or that her hands are any more unclean than the defendant's.

Counsel on both sides of the case have been zealous in making the best of very difficult problems of proof and ought not to be faulted too badly if sometimes their tempers have risen. It is easy for the dispassionate court to preach the virtue and necessity of professional coldness on the part of counsel, but the trial practice is hard for attorneys. Our adversary system of trial, which we extol so highly as a means of reaching the truth, requires that the attorneys fight with all their force and skill to maintain their client's position. We cannot insist that the parties fight, and then cast them into outer darkness because blows are exchanged.

For all of these reasons, the defendant's motion to dismiss or for other relief is overruled. No possible useful purpose could be served by reopening or retrying those issues which have been tried. To do so would only make confusion more confounded.

Returning then to the resolution of the matters which are still pending, the Court finds that this action was originally commenced as a class-action suit involving sex discrimination in employment. After a great deal of preliminary matters were disposed of, the liability issue came on for trial commencing on February 3, 1975. The trial lasted several days, and as a result the Court made numerous findings of fact and conclusions of law in the form of an opinion which was filed November 18, 1975. On the same date an order was entered upon the Court's findings. This order, among other things, disposed of the class action aspects of the suit. The Court found that the plaintiff individually was entitled to recover damages, both compensatory and punitive. It ordered that if the parties could not agree upon the amount of damages, the case would be set for hearing upon that issue.

Thereafter, the matter was taken to the Court of Appeals on an interlocutory appeal. After reversal, on July 24, 1978, the Court, in a memorandum and order vacated the November 18, 1975 order so as to reinstate the matter as a class action, which it then decided adversely to the members of the class. The Court also modified its former order granting the individual plaintiff punitive and compensatory damages, and ordered that if the parties could not agree upon the amount of damage, a hearing should be had to determine the plaintiff's damages, which were to be in the nature of equitable restitution, including, but not necessarily limited to, back pay.

The parties were unable to agree, and a hearing on the damage issue was held on April 12, 1979. The full day was required for the presentation of evidence. A briefing schedule was established for the argument, with the final brief being filed on June 12, 1979.

The evidence presented the same problems that were presented on the trial of the liability issue. This time there were no disinterested witnesses, and very little circumstantial or objective evidence which would help a finder of fact to determine which of conflicting statements were true. Again all the witnesses were untruthful in greater or less degree. As was said in this Court's opinion of November 18, 1975, "(T)his is not unusual in cases where ideas and intentions tend to seem more important than objective facts. The natural human defect of mistaking one's view of particular facts for the facts themselves does not give the finder of facts too much difficulty so long as there is a sufficient amount of real or circumstantial evidence to form a basis for evaluation of this testimony." Here again, that "real or circumstantial evidence" is not abundant, and the difficulties of digging it out from the welter of arguments about the conclusions to be drawn have been extremely formidable.

In order to do this task properly in such a case as this requires substantial blocks of time spent in almost monastic seclusion. These are hard to come by in a trial court beset by an unending stream of demands for interlocutory injunctions, all supported by persuasive showings of irreparable harm. This Court is deeply troubled that so much time has elapsed since this matter was heard and argued, but that time has not dimmed the conflicts in the evidence, nor made the issues any more beclouded than they were on the date of the hearing.

Basically, the plaintiff's evidence showed that at the time she was employed, she was to do work in which she was skilled and experienced, taking over that work from a group of hourly employees and low-level supervisors who had been doing it badly and inefficiently for a long time. She was to set up and direct the work of a new group of management employees who were to be hired to do the work under her direction.

Since her constructive discharge, the plaintiff contends that she has always been ready, willing, and able to do the work, if permitted to do it free of the sexual harassment to which she was subjected; that had she continued to do the job she was hired to do, she would, at the time of hearing, have still been in the employ of the defendant, but at a higher level, where her pay and fringe benefits would be substantially larger than she was receiving at the time of her discharge; and that although she had made constant efforts to obtain equal or better employment, she has been unable to do so, getting only temporary positions that have produced small earnings.

■ The defendant contends that plaintiff, within a few months after leaving its employ, removed permanently from the region of Ohio, Michigan and Indiana where she could have been employed, and thus was no longer available for work in its employ; that in addition to that, at the time of the trial of the liability issue, she refused an employment offer from the defendant; that in any event, if she had remained in the defendant's employ up to the time of

hearing, her employment would have been at a much lower level of salary and fringe benefits than plaintiff suggests; and finally, that plaintiff has made no real effort to get and keep steady employment, so that she could reasonably have earned much more than she actually did.

The basic rule for relief in such cases as this is stated as follows:

"While affirmative action may not be limited to the reinstatement or hiring of employees with or without back pay, we believe that it is limited to relief of the same general kind, that is, equitable relief in the form of restitution." *E. E. O. C. v. Detroit Edison Co.*, 515 F.2d 301, 309 (6th Cir. 1975) *vacated on other grounds* 431 U.S. 951, 97 S.Ct. 2668, 53 L.Ed.2d 267 (1977).

The issue of back pay as the basis for determining damages is established by *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Thus, as this Court held in its memorandum and order of July 24, 1978, the Court must determine the equitable restitution necessary to place the plaintiff in the position she would have enjoyed but for the unlawful discrimination practiced against her.

■ The first factual issue involved in this determination is whether or not the plaintiff would have remained and advanced in the employment of the defendant up to the time of the hearing of the issue of damages.

The resolution of this issue is firmly bound up with the basic facts of the discrimination against the plaintiff. The evidence is clear that at the time plaintiff was employed, both she and the defendant believed that she had the capability of being an important managerial employee. Instead of working with her to enable her to develop her ability and experience, as a member of defendant's staff, after a good beginning her potential was destroyed by the defendant's discriminatory action.

The plaintiff, at the time of her employment and discharge, was in a comparable position to one R. P. Markwood. If any-

thing, she was a little above him in the executive hierarchy. While his experience in some respects was greater than hers, her education and training in other respects was far greater than his. The evidence was clear that Markwood was one of the principal agents of the defendant's discriminatory activities, and the fact that instead of being punished for or restrained from his discriminatory actions, he was being put in a position to do plaintiff still more harm clearly established plaintiff's constructive discharge.

The evidence clearly shows that Markwood, at the time of the damage hearing, was still in the defendant's employ, but had advanced in a manner and to a position that plaintiff could normally have expected to advance. Had plaintiff advanced as Markwood did, her earnings to the date of the trial would have been approximately $263,000.00 plus certain fringe benefits.

The evidence does not support the defendant's contention that plaintiff's position and prospects were not equivalent to Markwood, but only to that of one Charles Miller and others, whose compensation was at a much lower rate, and whose jobs were subsequently abolished. On the basis of this claim of the defendant, the plaintiff's earnings, had she remained in defendant's employ to the time of trial, would have been approximately $83,900.00.

The legal problem is somewhat more difficult than the factual dispute, for in this case the plaintiff has not, since she left defendant's employ, obtained a position more advantageous, financially or otherwise, or even close to being as advantageous, as her position with the defendant.

There is no dearth of case law in the area, which the parties have explored in their briefs, and the Court has studied, but none of the cases present a factual situation bearing a close resemblance to that presented here.

Basically, the problem is: if equitable restitution is to place the plaintiff in the economic position she would have enjoyed but for the wrongful discrimination suffered, for how long a time must she be maintained in that position? Some courts have resolved the problem by holding that it is too speculative to assume retention in the particular job for more than a relatively short time. *Barnes v. Rourke*, 8 FEP 1112, 1116 (M.D.Tenn.1973); *Singleton v. Vance Co. Bd. of Ed.*, 8 FEP 205.211 (E.D.N.C. 1973), remanded on other grounds, 501 F.2d 429 (4th Cir. 1974).

The defendant seems, at least to some extent, to argue for this position. It seems to the Court to be contrary to the basic legal premise that a situation once shown to exist will be presumed to continue until there is a showing that some intervening cause has changed it. Nor does this position square with the fact that plaintiff's fellow employee Markwood was still employed by the defendant at the time of trial. This demonstrates, as did the evidence on the liability issue generally, that long-term employment is characteristic of defendant's work force. The Court finds that had plaintiff not been driven from defendant's employ, she would, at the time of hearing, have been in substantially the same position with the defendant as Markwood was. One of the commonest reasons for terminating back pay in Title VII cases, that the plaintiff obtained a better paying job than her position with defendant (see, e.g. *Reid v. Memphis Publishing Co.*, 521 F.2d 512, 514 (6th Cir. 1975); *Weiner v. Oakland*, 14 FEP 380, 382 (E.D.Mich.1976)). *EEOC v. Midas, Inc.*, 8 FEP 719, 720 (D.N.M.1974) is not applicable here, as the evidence shows beyond any doubt that in spite of plaintiff's continuing efforts, she had been unable to get even a comparable job.

The defendant seems to place its heaviest reliance upon its contention that when the plaintiff and her husband left South Bend, Indiana, to go to Phoenix, Arizona in November, 1969, she was no longer available for employment by the defendant, and therefore is entitled to no back pay after the date of her departure for Phoenix. The Court is unwilling to accept this argument, for both plaintiff's testimony and her employment record prior to and after her employment by the defendant, show her to be

a very peripatetic person, who could and would go anywhere in the country that she could get the kind of work she wanted. The Court finds that the plaintiff is still available to do for the defendant the work she was originally employed to do.

The defendant also argues that the plaintiff refused to accept an offer of employment from it, and that the right to back pay terminates when the employee refuses an offer by the employer to re-employ. In this, defendant relies on *EEOC v. New York Times Broadcasting Service, Inc.*, 542 F.2d 356, 359 (6th Cir. 1976) and *Bishop v. Jelleff Associates*, 398 F.Supp. 579, 595 (D.D.C.1974) and a brief excerpt from the cross-examination of the plaintiff during the trial of the liability issue in 1975, as follows:

"Q. In this action and in this particular case do you seek to be reinstated with Jeep Corporation?

"A. I did at one time.

"Q. But you don't now?

"A. Hardly. That was six years ago." (1975 Trial Transcript p. 377.)

This Court is unwilling to accept a brief passage, particularly a passage of cross-examination, as the equivalent of an offer of re-instatement by the defendant, and a refusal of that offer by the plaintiff, so as to cut off, at that point, the plaintiff's right to further recovery.

The most that can be said for this bit of testimony is that it was related to the issue of whether the court, as part of remedies available in such action, could order the defendant to reinstate the plaintiff in her position. At the time of the liability trial, in 1975, that issue was open and unresolved, so this testimony had some relevance. It has since been determined that there could be no reinstatement of the plaintiff to her position, so the testimony is essentially meaningless. An offer and acceptance, or rejection, of even the simplest sales contract requires considerably more showing than is made by this testimony, even though it might not require the showing of all the elements set forth on page 9 of the plaintiff's post-hearing brief filed April 30, 1979, as derived from the case of *Coates v. National Cash Register Co.*, 15 FEP 222, 228–229, 433 F.Supp. 655 (D.C.Va.1977).

The Court finds that there was never an offer of re-employment by the defendant in the same or equivalent position, and that the plaintiff would not have refused such an offer had it been made.

Thus, it becomes necessary for the Court to determine what amount of money must be paid to the plaintiff equitably to place her in the economic position she would have enjoyed but for the unlawful discrimination practiced against her. This question can only be resolved on the basis of the situation as it stood on the date of the damage hearing. There is no evidence in the record as to what has happened since that date, although plaintiff seems to argue that she has still not obtained full time employment equivalent to or better than her position with the defendant. Nor did the evidence adduced at the hearing form any basis for an award of future damages, for only future damages that are reasonably certain to result can be compensated for. There can be no reasonable certainty that plaintiff's employment will continue to be below the level of her employment by defendant for even so much as one day.

It may well be that the Court's finding of discrimination leaves the plaintiff in the same position as a plaintiff in an action for a continuing nuisance or trespass, who can bring successive actions to recover damages occurring since the date of the last verdict, if the nuisance or trespass continues unabated. The question of plaintiff's right to bring future actions against the defendant cannot properly be resolved in this litigation, for no factual basis for a determination appears in the evidence before the Court. When and if such an action is brought, and evidence is introduced to support it, its propriety can be determined.

In addition to salary, plaintiff claims she is entitled to the monetary value of certain "fringe benefits," specifically hospitalization, a car leasing program, stock option plans, and pension rights.

As to hospitalization, although the defendant did provide hospitalization insurance for its employees, no specific allocation of cost was made to any individual employee. Under these circumstances, a plaintiff is only entitled to recover for medical costs actually incurred, not covered by insurance, which would have been covered under the defendant's program. There is no showing of any such medical expenses incurred by plaintiff, so nothing is due for hospitalization.

While there was some evidence that certain high salary level employees of the defendant were entitled to participate in some sort of a car leasing program, the record is devoid of any evidence as to the details of this program, when and if plaintiff would have been eligible to participate in it and what the actual cash benefits may have been to those participating in the program. Plaintiff's suggestion that the program would be worth $500.00 per year is a pure speculation. No award can be made for this item.

There is no evidence as to the details of any employee's stock option plan, and the defendant's answer to an interrogatory asserts that it has no such plan. The brief fails to show any basis for an award to plaintiff in this respect.

The evidence is vague concerning the defendant's employee pension plans. At the time plaintiff was employed, employees were eligible to enroll in such plans after three years of employment, but were required to contribute in order to participate. After ten years of participation, the right to a pension vested, subject to the employee reaching age sixty-five. At some time prior to the damage hearing, the pension plan was fully funded by the defendant, and the obligation of employees to contribute was terminated. The evidence does not show anything about how the amounts of the pensions were determined for those employees or former employees with vested pension rights who reached retirement age. It is impossible from the evidence offered to establish that plaintiff would have a right to any amount of pension benefits, either at the time of the hearing or in the future. No award can be made for any possible pension benefits.

■ The law is clear that in determining the amount of money necessary to place the plaintiff in the economic position she would have been had it not been for the defendant's wrongful acts, the defendant is entitled to set off the amounts plaintiff earned, or should with reasonable diligence have been able to earn, between the times of the wrongful act and the hearing.

The evidence shows that in that period plaintiff's actual earnings were $19,299.21. Her greatest earnings in any one year occurred in 1972, when she earned $7,851.35.

While the Court has previously found that plaintiff has continuously sought employment, and has not limited her willingness to accept suitable employment in any particular part of the country, the Court cannot conclude from that that the plaintiff could not reasonably have earned considerably more money than she did. There is much evidence in the record from which it can be concluded that the plaintiff, consciously or unconsciously, limited her opportunities to get employment in her efforts to do so. It is also clear that plaintiff did not follow the basic rules applicable to getting and keeping employment. It is better to take a poor job and work hard at it while searching for a better job than not to have a job at all. As between two otherwise equally qualified applicants for a job, the one who is currently employed has a better chance than the one who is unemployed.

The Court is impelled to a finding that the plaintiff should reasonably have been able to earn in each of the years after 1969 at least $7,500.00. Thus, from the date of discharge to the date of hearing, the defendant is entitled to a credit of $72,624.12 against the amount of $263,000.00 which the Court finds to be the amount plaintiff should have earned had she remained in the defendant's employ, leaving the net amount due to plaintiff $190,375.88, for which she is entitled to judgment. Interest will be awarded to plaintiff upon the judgment from the date of hearing, April 12, 1979, at

the rate of six percent (6%) per annum until July 30, 1980 and eight percent (8%) per annum thereafter until the judgment shall be paid, these being the interest rates under Ohio state law (§ 1343.03 Ohio Revised Code).

One other matter presently remains to be disposed of. The plaintiff asks, and is entitled to, an award for attorney's fees. The determination of attorney's fees in such cases as this is governed by *Northcross v. Board of Education of the Memphis City Schools*, 611 F.2d 624 (6th Cir. 1979). This case would make it clear that an evidentiary hearing is required to form a basis for an award of attorney's fees, even if there had already been some evidence adduced that would enable the Court to determine a proper amount of fees. It is clear that the parties will not be able to agree upon a proper attorney's fee for plaintiff in this case, so the matter will be set for hearing on Wednesday, March 3, 1982, at 9:00 A.M. Counsel shall file pre-hearing briefs on the matter of attorney's fees not later than Wednesday, February 24, 1982.

This opinion will serve as the Court's findings of fact and conclusions of law upon the issues presented.

THEREFORE, for the reasons stated, good cause therefor appearing, it is

ORDERED AND ADJUDGED that the motion of the defendant for dismissal of this action or to reconsider the liability determination, and if necessary, to reopen the record on the issue of damages be, and the same hereby is, OVERRULED; and it is

FURTHER ORDERED that the plaintiff have judgment against the defendant in the sum of One Hundred Ninety Thousand, Three Hundred Seventy-Five Dollars and Eighty-Eight Cents ($190,375.88), together with interest thereon at the rate of six percent (6%) per annum from April 12, 1972, until July 30, 1980, and thereafter at the rate of eight percent (8%) per annum until the same shall be paid, together with her costs herein expended; and it is

FURTHER ORDERED that the plaintiff be, and she hereby is, granted judgment against the defendant for a reasonable sum to cover her attorney's fees and expenses in this litigation; and it is

FURTHER ORDERED that if the parties do no sooner agree upon the amount of such judgment for attorney's fees and expenses, the amount shall be fixed by the Court after hearing to be had commencing at nine o'clock A.M. on Wednesday, March 3, 1982, with pre-hearing briefs to be filed by the parties not later than Wednesday, February 24, 1982.

IT IS SO ORDERED.