Ray **MARSHALL,** Secretary of Labor, United States Department of Labor, Plaintiff,

v.

**ARLENE KNITWEAR, INC.,** Swan Sportswear Co., Inc. and Larry Stein, Defendants.

No. 75 C 1434.

United States District Court, E. D. New York.

July 7, 1978.

Carin Ann Clauss, Sol. of Labor, Washington, D. C., Francis V. LaRuffa, Regional Solicitor, New York City, for plaintiff by Jay S. Berke, Jack R. Fisher, New York City.

Coles, Weiner & Tesser, New York City, for defendants by Harold M. Weiner, Lewis F. Tesser, New York City.

## MEMORANDUM AND ORDER

NEAHER, District Judge.

The Secretary of Labor ("Secretary") brought this action to obtain relief for an elderly employee of defendants whose employment had been terminated in alleged violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621–34. After trying the matter without a jury, the court makes the following findings of fact and conclusions of law as required by Rule 52(a), F.R.Civ.P.

## I. INTRODUCTION

On September 1, 1973, Bertie Feitis, a 62-year-old clothing designer, was discharged by defendant Arlene Knitwear, Inc. ("Arlene") after 17½ years with the company. At that time she was only 2½ years away from early retirement and only 3 years away from the normal retirement age and full pension eligibility. She was notified of her discharge by Arlene's president, defendant Larry Stein, who explained that she and Arlene's two other designers had to be let go because the business was going to be liquidated. Stein promised that, when the liquidation took place, Feitis would receive her share of the pension fund, which would be liquidated along with the business.

Stein failed to mention, however, that the other two designers, Vincent Calvo, age 32, and Lucia DeSantis, age 29, were to continue their work under Stein's supervision at Knittin Pretty, Inc. ("Knittin Pretty"), a new company ostensibly formed by his son. Moreover, rather than following through on claimed liquidation plans, Stein negotiated with his two partners to buy out their shares in Arlene and its two companion companies, Swan Sportswear Co., Inc. ("Swan") and 465 Property Corporation. As soon as the buy-out agreement was signed on December 31, 1973, Knittin Pretty folded, Stein's son was installed as president of Swan, Calvo and DeSantis were transferred back to Arlene, and the designs they had created at Knittin Pretty became the new line of clothes for Arlene's coming season.

The net result of this fast shuffle was that the Steins were firmly in control of Arlene and its related companies, Arlene's design studio was staffed by two young designers, and 62-year-old Bertie Feitis was out of both her job and her pension. For the reasons given below, the court has concluded that the termination of Feitis consti-

tuted discrimination on the basis of age in violation of the ADEA.

## II. PRELIMINARY MATTERS

Before discussing the merits in detail, the court must deal with two preliminary matters raised by defendants. First, defendants contend that the ADEA is not applicable because Feitis' employer, Arlene, did not have enough employees to come within the scope of the Act. Second, they argue that the Secretary has not fulfilled a prerequisite to this suit, *viz.*, that he must affirmatively seek to achieve conciliation of the dispute.

### A. *Feitis' Employer*

The ADEA outlaws age discrimination by an "employer." An employer is defined as "a person engaged in an industry affecting commerce who has twenty or more employees . . . ." 29 U.S.C. § 630(b). The definition of "person" includes "one or more . . . corporations." 29 U.S.C. § 630(a). It is undisputed that during the relevant period Arlene had fewer than 20 employees, Swan had over 100, and each company was engaged in an industry affecting commerce. The key question, therefore, is whether Arlene and Swan may be considered as a single employer for purposes of the ADEA.

To begin, a brief history of the companies is in order. Swan was incorporated in 1948 and performed manufacturing services for a companion firm known as Dollar Knitwear, Inc. ("Dollar"), which designed and sold women's knitted tops. Larry Stein, Louis Nissenbaum, and Harry Weinstein each owned ⅓ of the shares in both Dollar and Swan. In 1953, in order to avoid the unfortunate connotation of the name "Dollar Knitwear," Stein and his two partners discontinued Dollar and incorporated Arlene in its place. For the next twenty years the three partners retained their equal shares in Arlene and Swan and held the following positions: Stein was president of Arlene, Nissenbaum was president of Swan, and Weinstein was in charge of shipping at Arlene.

At the time of Arlene's incorporation in 1953, Swan occupied half a floor of a four-story building located at 465 Troutman Street in Brooklyn, and Stein, as Arlene's president, occupied a cubicle within that space. Arlene also had a showroom at 1407 Broadway in Manhattan. During the next 20 years the two companies gradually expanded their space in the Troutman Street building. In 1965 or 1966, at a time when Arlene occupied the first floor and Swan the second, Stein and his two partners purchased the building through a corporation they had formed for that purpose, the 465 Property Corporation. As with Arlene and Swan, each partner owned ⅓ of the shares of the new corporation. By 1973 the two companies filled the entire building, as Arlene leased the basement and first floor and Swan the second, third and fourth floors.

With this background in mind, the inner workings of Arlene and Swan must be examined to determine whether they constituted a single employer for purposes of the ADEA. In light of the liberal construction to be accorded a remedial statute such as the ADEA, *Dartt v. Shell Oil Co.*, 539 F.2d 1256, 1259 (10 Cir. 1976), *aff'd mem.*, 434 U.S. 99, 98 S.Ct. 600, 54 L.Ed.2d 270 (1977), the appropriate standard for determining whether nominally separate corporations are to be considered a single employer is whether they comprise an integrated enterprise. Under this standard, which originally was developed in labor cases, see *Radio & Television Broadcast Technicians Local Union 1264 v. Broadcast Service of Mobile, Inc.*, 380 U.S. 255, 256, 85 S.Ct. 876, 13 L.Ed.2d 789 (1965), and later was applied to cases concerning Title VII of the Civil Rights Act of 1964, see, *e. g.*, *Williams v. New Orleans Steamship Association*, 341 F.Supp. 613, 615 (E.D.La.1972), the controlling criteria are (1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership or financial control. *Radio & Television Broadcast Technicians Local Union 1264 v. Broadcast Service of Mobile, Inc., supra; Baker v. Stuart Broad-*

*casting Co.,* 560 F.2d 389, 392 (8 Cir. 1977) (a Title VII case).[1]

■ In the present case the first and fourth criteria are easily met, for Stein and his two partners owned both Arlene and Swan and operated them as an integrated enterprise. The two companies perfectly complemented each other, and their physical proximity facilitated their integration. The work on each garment began when Arlene's designers created designs for knitted tops. After Swan's sewing department made samples of the designs, Arlene's salesmen took the samples and solicited orders from customers. Once customers ordered the garments, Arlene ordered fabric to fill the orders. Then Swan cut the fabric in the pattern of the designs and sewed the fabric together to make the garments. In the final step, Arlene shipped the garments to the customers.

The symbiotic relationship of Arlene and Swan is also apparent from the regular overlapping of work performed by several of their employees. Bernard Weinstein, Swan's production manager, had his desk next to that of Stein and placed Arlene's orders for fabric under Stein's watchful eye. The samples of knitted top designs were sewn together by Swan's employees in the sewing department under the supervision of Arlene's designers, who were located on the same floor as the sewing department. Max Samen, Arlene's production manager, was often on hand in Swan's sewing department to resolve production problems. After the garments were sewn, they were packed and stored in Arlene's stock room by several Swan employees under the supervision of Harry Weinstein, Arlene's shipping manager. Even the recordkeeping of the two companies was integrated, as their bookkeeping staffs were housed in the same office, were supervised by the same head bookkeeper, and made use of the same posting machine.

By 1973 the integration of the operations of Arlene and Swan was virtually complete, as 100% of the cutting and 50–60% of the sewing required by Arlene were performed by Swan, and 95–98% of Swan's business came from Arlene. Generally the sewing done by outside contractors was uncomplicated work, while the more difficult sewing jobs were performed by Swan.[2]

The second criterion, common management, is also satisfied. Although Stein generally controlled the affairs of Arlene and Nissenbaum did the same with respect to Swan, their joint interests led to common management of the two companies in significant ways. For example, Stein and Nissenbaum informally worked together to formulate prices that would be low enough to attract customers for Arlene and yet high enough to cover Swan's production costs. As their accountant testified, they cooperated because "they had the same interest as far as the necessary result, the bottom line." Tr. at V–93. Since they were partners, they also did not bother with such matters as charging each other rent for the offices of one company located on floors leased by the other company.

---

1. Because much of the ADEA, including its definition of "employer," was patterned after Title VII, the court properly may look for guidance to judicial constructions of the term "employer" in the context of Title VII cases. See *Dartt v. Shell Oil Co.,* 539 F.2d 1256, 1259 (10 Cir. 1976), aff'd mem., 434 U.S. 99, 98 S.Ct. 600, 54 L.Ed.2d 270 (1977).

The only two published ADEA decisions bearing on the meaning of "employer" at issue here are not inconsistent with the labor and Title VII cases. In *Brennan v. Ace Hardware Corp.,* 362 F.Supp. 1156 (D.Neb.1973), aff'd, 495 F.2d 368 (8 Cir. 1974), the district court simply held that a corporation with its principal office in Chicago and several branch warehouses elsewhere would be considered a single entity under the ADEA. In a more elaborate opinion, the court in *Woodford v. Kinney Shoe Corp.,* 369 F.Supp. 911, 916 (N.D.Ga.1973), declared:

"A parent corporation can be held liable under the Age Discrimination Act for the discriminatory employment practices of its subsidiary corporation *if* the parent corporation so controls the subsidiary that the subsidiary is merely the agent or instrumentality of the parent."

2. Nissenbaum's stipulated testimony was that, due to his "interest as a stockholder to maximize profits of Arlene," the "hard work" was reserved for consignment to Swan so that he could supervise and guard against mistakes. PX 47.

The family ties among the managers of the two companies further indicate their integration. Harry Weinstein, the shipping manager for Arlene and one of the three owners of the companies, was the brother-in-law of Nissenbaum, the president of Swan and another of the owners. Bernard Weinstein, the son of Harry Weinstein and the nephew of Nissenbaum, was the production manager for Swan and did much of his work under Stein's supervision. Another of Nissenbaum's brothers-in-law, Max Samen, was Arlene's production manager.

Stein's testimony as to the events of mid-1973 sheds additional light on the question of common management:

"In the middle of 1973 the continuation of this *business* became impossible. The principals had developed a very irreparable rift and there was no question in my mind that this *business* could not continue.

"The principal course of action here was to dissolve the *companies*." Tr. at V–156 (emphasis added).

Stein's choice of words in describing Arlene and Swan confirms that the two companies were run as a single business.

As to the third criterion, centralized control of labor relations, the record is less clear. There is no question that most employment decisions were made by the separate heads of the companies. As to the termination of Feitis, however, Stein initially testified at his deposition:

"It was a mutual decision [of the three partners]. It's four years later. It's vague in my mind. We decided to terminate the company and discharge all the designers. . . ." Stein Dep. at 116, PX 48(a).

The next day of the deposition Stein changed his testimony to reflect that he alone made the decision to fire Feitis. *Id.* at 247. At trial Stein testified as follows:

"[W]hen the three shareholders decided without question that this would be the complete termination of the business, we all moved in our separate areas of author-

ity and functions to move towards that end. I being in charge of the designers moved to terminate their employment. . . ." Tr. at II–137.[3]

Although even this testimony illustrates the indirect control the joint ownership had over the employment of all employees of Arlene and Swan, the record does not support a finding of centralized control of labor relations. Nevertheless, even a total lack of evidence of centralized control of labor relations would not bar a finding that Arlene and Swan formed an integrated enterprise, for no one of the relevant factors is controlling. See *Baker v. Stuart Broadcasting Co., supra,* 560 F.2d at 392.

Viewing all the relevant circumstances in light of the appropriate standard, however, it is not difficult to find that Arlene and Swan constituted an integrated enterprise and should therefore be considered a single employer for purposes of the ADEA.

Stein must also be regarded as Feitis' employer, for 29 U.S.C. § 630(b) includes within the definition of "employer" not only the corporate entity but also "any agent of such a person." Since Stein had a substantial ownership interest in and acted as an agent of the employer unit formed by Arlene and Swan, he was an integral part of that employer unit.

#### B. *Conciliation*

Section 7(b) of the ADEA, 29 U.S.C. § 626(b), requires that, prior to filing a suit under the Act,

"the Secretary shall attempt to eliminate the discriminatory practice or practices alleged, and to effect voluntary compliance with the requirements of this chapter through informal methods of conciliation, conference, and persuasion."

Defendants contend that the Secretary failed to fulfill this prerequisite to suit in the present case.

The evidence at trial established that the Secretary more than satisfied the concilia-

---

**3.** According to Feitis, Stein was the one who informed her of her termination, though Nis-   senbaum accompanied Stein to Feitis' office. Tr. at III–115.

tion requirement. On September 25, 1974, the same day Feitis informed the Department of Labor that she intended to sue Arlene under the ADEA, the Area Director of the Department's Wage and Hour Division sent a letter to Stein notifying him of the prospective suit and of the Secretary's responsibility to

"try to eliminate any alleged unlawful practice by informal conciliation, conference and persuasion. Assistant Area Director [Stanley Friedman] will call at your establishment on Friday, 10/4/74 at 10:00 a. m. to review the circumstances involved in this case and, if possible, to work out some solution consistent with the statute and agreeable to the parties." PX 1.

Friedman telephoned Stein on the same day to alert him to the forthcoming letter and to discuss the government's intention to interview employees and examine records at Arlene's offices. Stein replied that he would refuse Friedman admittance to his firm and that he would not meet with him to discuss the matter. When Friedman asked to meet with Stein's attorney, Stein referred him to Irwin Pollack, Esq.

On October 4, 1974, Friedman called Pollack, advised him of what had occurred previously, and arranged a meeting with him later that day. At the meeting, Friedman explained that the Department's objective was to "make whole" the complainant, i. e., provide her with "reemployment, with any wages that may have been lost and to continue her eligibility for pension money. . . ." Tr. at I–28. Friedman also asked to examine Arlene's records. In response to Pollack's suggestion that the Department's request for the records be put in writing, Friedman sent Pollack a letter on October 8, 1974, asking Pollack to make the necessary arrangements for the Department to examine the records.

When Friedman had not received a response to his letter by October 21, 1974, he turned his file over to the office of the Solicitor of Labor. On December 12, 1974, Ian Spier, Esq., an attorney from the Solicitor's office, telephoned Pollack and reached an agreement with him that, if Friedman specified the records he was seeking, Pollack would ask Stein for those records. Spier then referred the file back to Friedman, who called Pollack on December 16, 1974, to discuss the proposed examination of records. When Pollack again asked that the requests be in writing, Friedman again wrote Pollack a letter on December 18, 1974, asking him to arrange for the examination of records and interviews of Arlene's employees. Once again Pollack failed to respond, so that on January 10, 1975, Friedman called Pollack, who informed him that the government would not be allowed to enter Arlene's premises to examine records or to interview employees. Friedman thereupon referred his file for the second time to the Solicitor's office.

On March 3, 1975, the Regional Solicitor sent a letter to Pollack advising him that, if the records were not turned over voluntarily, he would obtain a subpoena to require their production. He also reaffirmed the Department's interest in eliminating any violation of the Act by conciliation or conference, and he warned: "If this method fails it will be necessary to commence a civil action in the United States District Court." PX 5. As a result of the letter, Pollack and Stein met with Friedman and Spier on March 19, 1975, to discuss the case. Spier reiterated his request for records, but Stein refused to turn them over unless he could see the government's file. When Spier refused, Stein stated that he would not turn over his records. He further indicated that he had no burden to rehire Feitis or give her back pay because he had done nothing wrong.

Two days later, Pollack called Spier to give him Stein's final position: no records and "no discussion of compliance because there was nothing to comply with." Tr. at I–58. Thereafter the Department issued a subpoena to Arlene to produce its records. When Arlene failed to comply with the subpoena, the Department moved in this court to enforce compliance. The court granted the motion, and Arlene finally produced the records.

After examining the records, the government maintained its position that a violation of the Act had occurred. When Spier informed Pollack of this, and further told him that the Department would file suit if Arlene did not voluntarily comply with the Act, Pollack replied that the Department should "go ahead and start your lawsuit because the company was not going to come into compliance." Tr. at I–59. The Department thereupon commenced this action on September 2, 1975.

On this record the court finds that the Secretary satisfied his obligation to "use exhaustive, affirmative action to attempt to achieve conciliation before legal action is begun." *Brennan v. Ace Hardware Corp.,* 495 F.2d 368, 374 (8 Cir. 1974). As in *Hodgson v. Approved Personnel Service, Inc.,* 529 F.2d 760, 764 (4 Cir. 1975), "[v]isits, telephone calls, and correspondence by Department personnel were part of a patient but unsuccessful effort to persuade [the company] to obey the law." Despite these efforts, Stein obstructed the government's legitimate investigation and was intransigent in the face of the government's requests that he comply with the Act. The Department satisfied the requirement given in *Brennan v. Ace Hardware Corp., supra,* at 375, that it give Stein several opportunities to respond to its request that he "make whole" the complainant, and it promptly notified him that it would sue to reach that result if he did not voluntarily comply with the Act. Stein's adamant stand fully justified the Department's own inflexibility, for Stein never allowed the negotiations to reach first base. Therefore, under the circumstances of this case, the conciliation requirement was met.

## III. AGE DISCRIMINATION

■ *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), provides the standards to be followed in disposing of actions challenging employment discrimination. The initial burden is placed on the plaintiff to establish a prima facie case of employment discrimi-

nation. If the plaintiff succeeds in doing so, the burden then shifts to the employer to justify its action on a nondiscriminatory basis. Finally, if the employer presents sufficient evidence to dispel the inference of discrimination arising from the plaintiff's prima facie case, it remains for the plaintiff to demonstrate that the employer's nondiscriminatory justification was simply a pretext for discriminatory action or was discriminatory in its application.

Although *McDonnell Douglas* was a Title VII case, its standards have been applied to actions arising under the ADEA. *Rodriguez v. Taylor,* 569 F.2d 1231, 1239 (3 Cir. 1977); *Marshall v. Goodyear Tire & Rubber Co.,* 554 F.2d 730, 735 (5 Cir. 1977); *Moses v. Falstaff Brewing Corp.,* 550 F.2d 1113, 1114 (8 Cir. 1977); *cf. Laugeson v. Anaconda Co.,* 510 F.2d 307, 312 (6 Cir. 1975), (*McDonnell Douglas* guidelines should not be borrowed automatically for ADEA actions). Since the ADEA is patterned after Title VII, the court believes it appropriate to employ the *McDonnell Douglas* standards in the present case.

■ As the Supreme Court recognized in *McDonnell Douglas,* the makeup of a prima facie case of discrimination may vary with the facts of each case. 411 U.S. at 802 n. 13, 93 S.Ct. 1817. In *McDonnell Douglas* itself, the Court held that a prima facie case of race discrimination in employment may be made by showing that: (1) the complainant belongs to a racial minority; (2) he applied and was qualified for a job for which the employer was seeking applicants; (3) he was rejected despite his qualifications; and (4) after his rejection, the position remained open and the employer continued to seek applicants from people of similar qualifications.

■ Applying that test as adapted to the facts of the present case, the court holds that a prima facie case of employment discrimination with respect to Feitis' termination would consist of the following elements: (1) Feitis was within the age group

protected by ADEA;[4] (2) she was doing satisfactory work; (3) she was discharged despite the adequacy of her work; and (4) two younger employees of substantially lesser seniority who were doing the same type of work were retained. See *Price v. Maryland Casualty Co.*, 561 F.2d 609, 612 (5 Cir. 1977); *Marshall v. Goodyear Tire & Rubber Co., supra; Wilson v. Sealtest Foods Division of Kraftco Corp.*, 501 F.2d 84, 86 (5 Cir. 1974).

At trial defendants conceded the first three elements of the Secretary's prima facie case and concentrated their attack on the fourth one, contending that Feitis was but one of three designers discharged at the same time in view of the impending liquidation of defendants' business. On the basis of the following detailed findings, however, the court has concluded that the Secretary met his burden of establishing all the elements of his prima facie case.

On January 23, 1956, Bertie Feitis was hired by Stein to be a designer for Arlene. Throughout her subsequent years of employment, defendants' business enjoyed steady growth. During the first 13 years of her work, she was unquestionably Arlene's leading designer. Other designers were hired during this period, but none achieved the success and permanence of Feitis.

In 1969, when Feitis was 57 years old, Stein hired Vincent Calvo, a 28-year-old designer with five or six years of experience. The following year Stein hired yet another designer, 24-year-old Lucia DeSantis, who had four years of design experience. From the time of their hire until August 1973, Calvo and DeSantis worked with Feitis in Arlene's design studio. Each functioned independently, though in addition to her own work DeSantis assisted Feitis when called upon to do so. Defendants concede that Feitis continued to perform her work in a satisfactory manner throughout her employment.

Despite the satisfactory quality of her work, Feitis was terminated from the payroll of Arlene on September 1, 1973. At that time Feitis was 62 years old, had been with the company 17½ years, and was only 2½ years away from early retirement and only 3 years away from the normal retirement age and full pension benefits. She was informed of the termination only the day before, when Stein came to her and explained that he was discontinuing the design studio because the entire business was going to be liquidated. Stein promised that, when the liquidation occurred, the pension fund also would be liquidated and the proceeds would be distributed to all the employees, including Feitis, in their proportionate shares.

Stein, however, deceived Feitis. As will be described more fully below, it is clear that he never intended to liquidate the companies, but rather planned to buy out his partners and eliminate the higher salary and pension obligations owing to Feitis. Moreover, although he also removed Calvo and DeSantis from Arlene's payroll in August 1973, he secretly retained their services within his control and maintained their pension status with Arlene until shortly before the trial of this action. When he bought out his partners a few months later, he brought Calvo and DeSantis out of hiding and re-established them in Arlene's design studio. Then he dealt a final blow to Feitis by preventing her from obtaining her pension benefits.

In order to fully comprehend Stein's scheme, his activities during the entire year of 1973 must be examined. In January of that year Stein put his son, Leonard Stein ("Leonard"), on Arlene's payroll. Leonard, then 25, had driven a taxi for the previous year and a half after graduating from Boston University in 1971 with a degree in business administration. Stein wanted to train his son in all phases of the business so that he eventually could succeed him. During Leonard's first few months of work, however, some of the ideas he advanced were strongly opposed by Stein's partners.

---

4. The ADEA now covers individuals who are at least 40 but less than 65 years of age. 29 U.S.C. § 631. Under the ADEA Amendments of 1978, the upper limit will be 70 years of age as of January 1, 1979. P.L. 95–256 § 3.

The resulting friction between Stein and his partners, added to other conflicts already present, led to a decision to end the partnership.

Although there is testimony that in June 1973 the partners informally agreed to liquidate the companies, that decision was never reduced to writing, and the inference is compelling that Stein was not going to let the business be liquidated. Stein realized that liquidation of Arlene and Swan would yield little compared to their value as a going business, and that it would be far better to eliminate his troublesome partners and gain complete control of Arlene and Swan. Obviously to improve his bargaining position, he decided to close Arlene's design studio prior to announcing his intention to buy out his partners. This reduced the value of the business and made it easier to obtain his partners' shares at a lower price, particularly since they were unaware that Stein planned to retain the services of Calvo and DeSantis to create the all-important designs for the next season.

The first step in Stein's scheme came in June 1973, when he discussed with his son, Leonard, the formation of a new company to be operated by Leonard. In order to mask his involvement in the company, Stein suggested that, rather than using his own money, his wife (Leonard's mother) be the source of the new company's capital.[5] Leonard then obtained the necessary loan from his mother and incorporated the new company under the name "Knittin Pretty" on June 26, 1973.[6]

During June Stein also decided that the best time to close Arlene's design studio would be upon completion of the designs for the holiday line in August 1973.[7] After further discussion with Leonard, he approached Calvo and DeSantis, told them Arlene was going to be liquidated, and asked whether they would like to work for Knittin Pretty.[8] They immediately accepted the offer but remained on Arlene's payroll until the end of August.

Next, Stein helped establish an import program of Portuguese garments for Knittin Pretty, since the new corporation had no production facilities. On June 30, 1973, Stein and his son, along with Calvo, DeSantis and Stein's wife, flew to Portugal at Knittin Pretty's expense. Leonard needed his father's expertise, for, as Stein testified, "He expected to consult with me and my presence there was justified in a business

---

5. In response to the following questions by the Secretary's attorney, Stein gave the following answers:

"Q. Isn't it true that you would have lent him the money yourself except that you did not want your business partners to know that you were affiliating with Knittin Pretty?

"A. I thought there was a moral issue here. It was strictly moral. I had no restrictive covenants. I thought in terms of keeping this new projected enterprise to a separate and distinct basis. I felt that my personal money should not be involved.

"Q. Did you also feel that way about your personal services being involved?

"A. No, I felt very generous and very willing to help my son." Tr. at III–46–47.

6. At trial Leonard claimed that he could not remember how much money his mother lent him. Tr. at III–162. Stein testified he did not know the amount of the loan, although he did know that his wife had a substantial sum of money to lend Leonard. Tr. at III–46. Knittin Pretty's income tax return for 1973 shows $31,361.76 in loans from stockholders and $10,000 in common stock.

7. Each year Arlene had four lines of knitwear: the spring, summer, fall and holiday lines. The designers worked on each line about three months, after which it would be put into production. When the designers completed the holiday line in August 1973, the remaining employees of Arlene and Swan still had several months of work manufacturing and selling the garments in the line—further indication that there was to be no "liquidation" of the business.

8. DeSantis testified that Larry Stein told her that

"Arlene Knitwear was going out of business and in that same breath I was also told that Leonard Stein was going to start his own company and he would like me to go and work for him and would I want to." Tr. at V–70.

Calvo testified in similar vein:

"How I found the job?

"I was approached by Larry Stein, who was starting his own company, and would we like to hook up with him. And we said yes." Tr. at IV–112.

sense." Tr. at III–49. Calvo and DeSantis, who were still Arlene employees at that time, also lent their advice on the best garments to select.[9] The Portuguese trip, which lasted two weeks, was kept secret from Feitis, as was true of all else concerning Knittin Pretty.

At the end of August 1973, when the designs for Arlene's holiday line were completed, Stein carried out his plan to "close" Arlene's design studio. First he removed Calvo and DeSantis from Arlene's payroll, which allowed them to move immediately to a new studio set up by Knittin Pretty and begin work on the spring line. They were given no severance pay from Stein, they received the same salary from Knittin Pretty as they had from Arlene, and Stein continued to guide their work as he had at Arlene. Also, on August 31 Stein informed Feitis that she and the other two designers had to be terminated because the business was going to be liquidated. This was the first Feitis had heard of either the proposed liquidation or the termination of the designers. Stein promised her that when the business was liquidated she would receive her share of the pension fund, which would also be liquidated. In addition, Stein gave Feitis two weeks' severance pay.

Shortly after the design studio at Arlene was closed, Stein began active negotiations with his partners to buy them out. He had a distinct bargaining advantage, for he knew he could use the Knittin Pretty designs for the Arlene spring line if the negotiations were successful. His partners, on the other hand, were unaware of Knittin Pretty. After two months of negotiations, Stein's partners orally agreed in early November 1973 to accept Stein's offer to buy their shares.

At that point Stein immediately brought his son Leonard over to the Troutman Street building to run Swan during the transitional period prior to the written buy-out agreement. During the next two months the designs Calvo and DeSantis had created while at Knittin Pretty were given to Arlene, although they continued to work at Knittin Pretty's design studio until the end of December. These designs became Arlene's entire spring line. In addition, the Portuguese garments imported by Knittin Pretty were turned over to Arlene as soon as they arrived from Portugal near the end of 1973. Arlene paid no consideration to Knittin Pretty for these designs and garments.

On December 31, 1973, Stein and his partners entered into a written contract whereby Stein bought all the shares his partners held in Arlene, Swan, 465 Property Corporation, and three other knitwear companies. Stein then transferred most of his newly-acquired shares to members of his family [10] and installed his son Leonard as president of Swan. At the same time Calvo and DeSantis, at Stein's request, returned to Arlene's design studio, and Knittin Pretty was no more.[11] Stein testified he considered asking Feitis to return, but he decided that he needed only two designers and that the work of Calvo and DeSantis was superior to that of Feitis.

Meanwhile, in November 1973, Feitis learned from her contacts "in the market" that Stein was going to buy out his partners and reopen Arlene's design studio with Calvo and DeSantis. Tr. at IV–70. In the same month, Feitis happened to meet Stein on the subway, where Stein told her: "I think we have found a way to pay you your pension and I shall call you after the 1st of the year, don't worry, you are in good hands." Tr. at IV–65. When Stein had not called her by the end of January 1974, Feitis called Stein, who referred her to the

---

9. Calvo and DeSantis used their vacation time from Arlene to make the two-week trip for Knittin Pretty.

10. Of the shares in Arlene, Swan ánd 465 Property Corporation, Stein retained $12\frac{1}{2}\%$ in each company and gave Leonard 25%, his two daughters each 25%, and his wife $12\frac{1}{2}\%$.

11. Although Knittin Pretty's income tax return for 1973 shows a loss of $41,378.65, over half of that consisted of the salaries of Calvo and DeSantis and the cost of the designs and garments that were turned over to Arlene.

pension plan company to find out about her pension. Feitis thereupon went to the pension plan company and learned that she was not eligible for a pension. As she put it at trial: "I couldn't believe my ears." Tr. at IV–65.

Thereafter Feitis called several times, but Stein was unavailable. Finally in mid-March Stein called Feitis and explained that he had not been able to return her calls because he had been ill. Feitis requested her job back, but Stein refused to rehire her. In one final attempt to obtain her pension benefits, Feitis asked Stein to grant her two years of permitted leave, and then allow her to return to work at the end of that period for the six–nine months necessary to make her eligible for her pension.[12] Stein refused this request, also.

On February 28, 1975, the pension plan company was notified by Arlene that Feitis was terminated on September 1, 1973. Nothing was reported at that time, however, as to any termination or break in employment of Calvo or DeSantis. Not until two months prior to trial was the pension plan company notified that the two younger designers had not worked for Arlene from August 31, 1973 to January 1, 1974.[13]

In the circumstances shown by the credible evidence, defendants' contention that Feitis was only one of three designers simultaneously discharged for business reasons cannot be accepted. The undeniable fact is that Stein and his corporation, Arlene, remained the *de facto* employer of the two younger designers while Feitis was discharged. In actual effect, Arlene's design studio, minus Feitis, simply was temporarily moved to different quarters, as Calvo and DeSantis performed the same design work they had done at Arlene and under the same supervision, i. e., Stein's. Unlike Feitis, the two younger designers did not miss a day of work, continued to receive the same salaries, and were not paid severance pay. Even their pension rights remained unchanged until just prior to trial. The designs they created at Knittin Pretty were turned over at no cost to Arlene, which used them as its entire spring line. Its function fulfilled, Knittin Pretty dropped from sight, and the business of Arlene and Swan continued without missing a step.

The finding that Stein kept the younger designers while discharging Feitis completes the Secretary's prima facie case of age discrimination with respect to Feitis' discharge.[14] It is a strong prima facie case, for the court has no doubt that, in cutting the design staff from three to two, Stein

---

**12.** Eligibility for pension benefits under Arlene's pension plan is based on the length of the unbroken "credited service" an employee has with the company. Under § 3.3. of the plan, "Permitted Leave does not constitute a breach in credited service." PX 43. "Permitted Leave" is defined as

"any leave of absence approved by an Employer provided that, upon termination of any such permitted leave of absence, not in excess of two (2) years, such Employee promptly returns or has returned to the employ of an Employer without employment elsewhere in the meantime, except with the consent of an Employer. In granting leave, each Employer shall act in an equitable and non-discriminatory manner." *Id.* at § 1.20. The consulting actuary who served Arlene's pension plan testified that, had Stein acceded to Feitis' request, it would not have offended the plan. Tr. at II–73.

Feitis would have been eligible for early retirement, after 20 years of service with the company, on February 1, 1976. Her normal retirement date, when she would be eligible for full pension benefits, was September 1, 1976, the first day of the month following her 65th birthday.

**13.** They then lost credit for service prior to January 1, 1975, the first of the year following their return to Arlene.

**14.** The Secretary also attempted to make out an alternative prima facie case with respect to the failure to rehire Feitis after December 31, 1973, by establishing that (1) Feitis was still within the age group protected by the ADEA, (2) she was qualified for the two jobs available, (3) she was rejected despite her qualifications, and (4) the jobs instead went to two younger employees possessing similar qualifications. See *McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 802, 93 S.Ct. 1817. It is not necessary to reach this alternative prima facie case because the court has found that the Secretary successfully established a prima facie case with respect to the termination of Feitis. Thus the failure to rehire her simply aggravates the damages.

chose Feitis as the one to be discharged because of factors intimately related to Feitis' age. First, Stein selected her because of her higher salary, which she had attained as a result of raises given her during her many years of work. Another reason was that she was expected to work only a few more years, whereas the two younger designers were far away from retirement. Finally, by precluding Feitis from receiving her pension, Stein reduced the level of payments Arlene would have to make into the pension fund in the future. While, in the absence of the ADEA, the first two reasons may appear to be valid business reasons, Congress has decreed in the ADEA that an employee may not be discharged because of her age. Where economic savings and expectation of longer future service are directly related to an employee's age, it is a violation of the ADEA to discharge the employee for those reasons. See *Coates v. National Cash Register Co.*, 433 F.Supp. 655, 661 (W.D.Va. 1977); *LaChappelle v. Owens-Illinois, Inc.*, 513 F.2d 286 (N.D.Ga.1970).

Once the plaintiff establishes a prima facie case of age discrimination, the burden shifts to the defendants to justify their action on a basis other than age. This burden has occasioned considerable confusion. Although the Supreme Court in *McDonnell Douglas* stated at one point that the employer simply must "articulate some legitimate, nondiscriminatory reason," 411 U.S. at 802, 93 S.Ct. at 1824, at another point it described this as a "burden of proof." *Id.* at 803, 93 S.Ct. 1817. In Title VII cases most circuits have construed the *McDonnell Douglas* case as shifting to the employer the burden of proving his legitimate, nondiscriminatory reasons by a preponderance of the evidence. See, e. g.,

*Turner v. Texas Instruments, Inc.*, 555 F.2d 1251, 1255 (5 Cir. 1977); *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 399 (3 Cir. 1976), *cert. denied*, 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed. 753 (1977); *Vulcan Society of the New York City Fire Dept., Inc. v. Civil Service Commission of the City of New York*, 490 F.2d 387, 393 (2 Cir. 1973).

In ADEA cases, however, some courts have been reluctant to impose such a burden on the employer. Whereas the Eighth Circuit held in *Moses v. Falstaff Brewing Corp., supra*, 550 F.2d at 1114, that the establishment of a prima facie case shifts the burden of proof to the employer to justify the existence of any disparities, the Fifth and Sixth Circuits refuse to shift the burden of proof to the employer. See *Price v. Maryland Casualty Co., supra*, 561 F.2d at 612; *Laugeson v. Anaconda Co.*, 510 F.2d 307, 311–13 (6 Cir. 1975). For example, in *Price* the Fifth Circuit held that, upon a prima facie showing by the plaintiff, the burden of proof stays with the plaintiff but the burden of production shifts to the employer.[15]

After considering these authorities, the court cannot perceive any valid reason for not applying the same burden-shifting standards to both Title VII and ADEA cases. The statutes are each remedial in nature, and the ADEA was clearly patterned after Title VII. Age discrimination, while often more subtle than race or sex discrimination, is equally pernicious. Once the plaintiff presents sufficient evidence to establish a prima facie case of age discrimination, it does not seem unfair or inappropriate to place on the employer the burden of proving that there was a legitimate, nondiscriminatory reason for its actions.[16] The employer does not have the burden of proving that it did not discrimi-

---

**15.** This also appears to be the view expressed in a Note entitled *The Age Discrimination in Employment Act of 1967*, 90 Harv.L.Rev. 380 (1976), in which the author suggests that the less invidious nature of age discrimination as opposed to race and sex discrimination militates against shifting as heavy a burden onto the shoulders of ADEA defendants as Title VII defendants must bear.

**16.** The court adopts the following reasoning of the Fifth Circuit in *Turner v. Texas Instruments, Inc., supra*, 555 F.2d at 1255–56:

"We would not act consistently with our national policy in favor of eliminating racial discrimination in employment if we did not allow the plaintiff to challenge the factual validity of an employer's reasons offered to rebut a plaintiff's prima facie case. Further, the employer benefits by utilizing these rea-

nate; if it proves any legitimate, nondiscriminatory reason, it remains for the plaintiff to prove that that reason was a pretext for discrimination or was applied in a discriminatory fashion.

The sole reason given by defendants to rebut the Secretary's prima facie case was that Calvo and DeSantis were better designers than Feitis.[17] The principal testimony in support of this contention was that of Stein, who stated that he selected Calvo and DeSantis rather than Feitis because

> "the designs which they [Calvo and DeSantis] have been producing for the last few seasons were far superior to those that were being produced by Ms. Feitis. The decision that brought me to this point was based on the fact that the sales of the garments produced by these two designers were great, were good sellers, were reordered numbers and were the keystone of my line." Tr. at II–162.

Stein, however, was unable to produce any records in support of this testimony. The sales records for each design were routinely destroyed at the end of each season, and no written evaluations were made of the designers.

In addition, Calvo testified that his designs constituted 60–80% of Arlene's line each season and represented 99% of Arlene's sales. In light of Calvo's stormy relationship with Feitis,[18] however, and his overarching ego, the court does not credit Calvo's inflated performance statistics. Even Stein would not endorse the percentages cited by Calvo.

The credible evidence presented at trial indicates that Feitis was approximately as good a designer as Calvo and better than DeSantis. The most probative testimony came from Stein himself, who admitted that, of the designs offered for sale by Arlene in 1972–73, those created by Feitis equalled in number those by Calvo and were more numerous than those by DeSantis.[19] This is particularly convincing because Stein limited Arlene's line each season to the best 100–120 designs produced by his three designers. As Stein testified, "I selected what I believed to be the most salable samples, the most desirous merchandise that would comprise my line." Tr. at VI–73.

Another indication of Feitis' ability and value to the company was her salary. Stein paid Feitis a weekly salary of $450, which was $75 a week more than Calvo received at the time and double the pay of DeSantis. Feitis' experience was valuable, for as Stein acknowledged, "she knew exactly what the requirements of my business were . . .." Tr. at II–146. As the most experienced of Arlene's three designers, Feitis often would write the seasonal fashion memo describing the new styles and fabrics to Arlene's sales-

---

sons to rebut the plaintiff's prima facie case—in essence, the reasons act as an affirmative defense to the prima facie discrimination claim—and the risk of nonpersuasion should fall on the party benefitting from the defense.

"*McDonnell Douglas* does not proscribe the approach we take in this case. Although *McDonnell Douglas* stated only that the employer had a burden of *articulating* a legitimate, nondiscriminatory reason for his action, 411 U.S. at 802, 93 S.Ct. 1817, the Supreme Court did not elucidate the extent of that burden. The primary question before the Court was whether the employer's articulated reasons could rebut a prima facie case. The factual basis of the employer's reasons was undisputed. We think that if the Court were presented with our situation—where the factual truth of the reason articulated is in dispute—it would require the employer to prove its reasons by a preponderance." (Footnotes omitted.)

Although this statement was made in a Title VII case, and the Fifth Circuit distinguished ADEA cases, *id.* at 1255 n. 2, this court finds the language fully applicable to ADEA cases.

**17.** At trial defendants pressed this contention in rebuttal of the government's alternative prima facie case concerning the failure to rehire Feitis. See n. 14, *supra*. The contention is equally applicable to the termination.

**18.** Due to their frequent conflicts, Calvo and Feitis worked in separate rooms. As Calvo admitted at his deposition, "I can't stomach her." Dep. at 71, Tr. at IV–133.

**19.** During Calvo's first three years at Arlene, 1969–72, Feitis's relative contribution to the line was even higher, for Calvo testified that during that period only about 25% of the line consisted of his work. Tr. at IV–119.

men. When Feitis was discharged, Calvo assumed this responsibility.

Additional relevant testimony came from DeSantis, who stated that Feitis was as competent as Calvo or she was in designing clothes for the junior market, which was Arlene's target in 1973.

After reviewing this scant evidence, the court finds that defendants have failed to prove that the design work of both Calvo and DeSantis was superior to that of Feitis. The mere *ipse dixit* of Stein cannot be accepted in satisfaction of the employer's burden of rebutting the Secretary's prima facie case of age discrimination. Stein's credibility was not enhanced by the position he took before the New York City Human Rights Commission with respect to Feitis' age discrimination complaint. There, in response to Commission interrogatories, Stein stated:

> "The decision not to rehire the complainant was not because of her age and not because her work while in our employ was unsatisfactory. It was purely a matter of dollars and cents, which balanced in favor of the two persons who were rehired." PX 18, Continuation Sheet.

At trial, he attempted to disavow this admission, calling it "unfortunate." Tr. at II–165. His attempt to explain the reference to "dollars and cents" as merely meaning that the Calvo and DeSantis designs were outselling those of Feitis, Tr., at III–104, was equally unconvincing in light of the contrary evidence. So also was his denial of any relationship between his decision to discharge Feitis and the fact that her salary was greater than the salaries of the two younger designers. Tr. at V–38–39. The evidence compels the conclusion that the savings in salary and the unpaid pension benefits accruing to defendants as a result of Feitis' discharge were the controlling economic factors behind her termination. Since such economic factors are directly related to age, Stein's reliance on them to discharge Feitis constitutes age discrimination.

## IV. RELIEF

Once a violation of the ADEA is found to have occurred, the court has jurisdiction to grant such legal or equitable relief as may be appropriate to remedy the violation. 29 U.S.C. § 626(b). Under the circumstances of this case, the court finds that Feitis is entitled to be made whole for the losses she sustained as a result of her wrongful termination.

The appropriate measure of relief is the amount of salary lost by Feitis from the date of her termination, September 1, 1973, to her normal retirement date, September 1, 1976, increased by the value of her pension benefits that would have accrued but for her termination, and decreased by severance pay and any amounts earnable with reasonable diligence.[20] See *Brennan v. Ace Hardware Corp.,* 495 F.2d 368, 373 (8 Cir. 1974); *Coates v. National Cash Register Co., supra,* 433 F.Supp. at 663.

Assuming that Feitis' salary would have remained at $450 per week during the three years of employment she lost, her salary loss amounts to $70,200. To this must be added the lump sum amount of her pension benefits, $57,218.38, payable to Feitis on her normal retirement date, for a total of $127,-418.38. This figure must be reduced by the $900 severance pay she received and any other earnings from employment.

Defendants failed to sustain their burden of showing any amounts earnable with reasonable diligence on the part of Feitis following her termination. See *EEOC v. Kallir, Philips, Ross, Inc.,* 420 F.Supp. 919, 926 (S.D.N.Y.1976) (Weinfeld, J.). Although defendants introduced a few advertisements for knitwear designers appearing in *Women's Wear Daily* during the first nine months after Feitis' discharge, they did not show that the openings were for a person of her qualifications or were comparable in pay, status and other factors to the position she lost at Arlene.

---

**20.** The court believes it inappropriate in this case to deduct unemployment compensation, a collateral benefit received by Feitis after her unlawful discharge. See *Marshall v. Goodyear Tire & Rubber Co.,* 554 F.2d 730, 736 (5 Cir. 1977).

Even if there were advertised openings that Feitis did not pursue,

> "[i]t is not fatal to recovery that one course of action, reasonably open but not followed, would have avoided further injury whereas another, also reasonable and taken, produced it. . . . The standard of what reason requires of the injured party is lower than in other branches of the law. . . . [Plaintiff] ought not [to] be deprived of recovery if its conduct came within the range of reason, even if the full light of reason was not, in fact, brought to bear." *Ellerman Lines, Ltd. v. The President Harding,* 288 F.2d 288, 290 (2 Cir. 1961), quoted in *EEOC v. Kallir, Philips, Ross, Inc., supra,* at 925 n. 14.

The principal avenue followed by Feitis was word of mouth contact, which she considered "the best way of finding a job" in her narrow, concentrated field. Tr. at IV–97. As vice-president of a small trade association, the New York Fashion Designers, she had excellent contacts. She testified: "I tried several personal leads [but] it was impossible to find a job and I am sure other designers would attest to that, especially at my age." Tr. at III–129. She also promptly registered with the needle trade unemployment agency of the Department of Labor, which provided a few leads, but none in her field. She had the same experience with the State unemployment insurance office, as the specialized nature of her skills limited the available opportunities.

Moreover, Stein frustrated Feitis' efforts to mitigate her damages. Not only did he deny her request for reinstatement, but he also rejected her plea that he enable her to obtain her pension benefits by granting her two years of permitted leave and then hiring her for six to nine months. Although Stein claims that he refused the latter request because it would be a "mockery" and could "compromise" his position as trustee of the pension plan, Tr. at V–191, the court finds that it was entirely within his authority to comply with the request, see n. 11, *supra,* and that to do so would have accorded fair treatment to Feitis and would not have amounted to a fraud upon the pension fund.

Therefore, the court finds that defendants failed to meet their burden of proving that Feitis did not make reasonable efforts to seek employment following her termination.

## V. CONCLUSION

To remedy defendants' violation of the ADEA, the Secretary is entitled to an injunction directing defendants to pay Feitis the amount computed in accordance with the guidelines given above, plus six per cent interest on increments of unpaid salary commencing September 15, 1973, and the same rate of interest from September 1, 1976 on the lump sum amount of her pension benefits. As Feitis' employers, the three defendants are jointly and severally liable for the required payment to her. The Secretary is also entitled to an injunction prohibiting future violations of the ADEA by defendants. Settle form of judgment on notice within fifteen (15) days of the date of this order.

SO ORDERED.